## BROWDER v. COOK et al.
### No. 1560.

District Court, D. Idaho, N. D.

June 16, 1944.

226

Messrs. Robertson & Smith, of Spokane, Wash., and Donald L. Burcham, of Oakesdale, Wash., for plaintiff.

W. F. McNaughton, of Coeur d'Alene, Idaho, and W. D. Keeton, of St. Maries, Idaho, for defendants.

CLARK, District Judge.

Plaintiff brought this action to recover damages for an alleged libel.

The complaint alleges in part:

"Plaintiff is now and has been at all the times hereinafter mentioned a citizen and resident of the State of Washington, where he is Postmaster at Oakesdale, Whitman County, Washington; and plaintiff, and each and all of the defendants are citizens and residents of different states, and the amount involved in this action exceeds $3,000.00 exclusive of interest and costs.

"Defendant Fulton Cook and Mrs. Fulton Cook, whose true Christian name is to plaintiff unknown, are now and have been at all the times hereinafter mentioned husband and wife, constituting a marital community under the laws of the State of Idaho; that said defendants are now and have been at all the times hereinafter mentioned residents of St. Maries, Benewah County, State of Idaho, and were engaged in business in said county operating among other businesses, a motion picture theater known as the Bungalo Theater of St. Maries, Idaho. That all of the acts and conduct hereinafter described and alleged were done by the defendant Fulton Cook while engaged in the business affairs of the community and were for the use and benefit of said community.

"Defendants A. M. Quane and Mrs. A. M. Quane whose true Christian name is to plaintiff unknown, are now and have been at all the times hereinafter mentioned husband and wife, constituting a marital community under the laws of the State of Idaho, and are residents of St. Maries, Benewah County, State of Idaho. That said defendants are now and have been at all the times hereinafter mentioned engaged in the business of publishing a weekly newspaper under the name and style of St. Maries Gazette-Record, which is a newspaper of general circulation throughout said Benewah County and northern Idaho and in Counties in Eastern Washington adjacent to Northern Idaho, including Whitman County, Washington.

"That in the month of May 1943, and for some time prior thereto plaintiff in his spare time had engaged in casual employment for a concern called the Ross Federal Service Inc., which was engaged upon a national scale in checking attendance at motion picture theaters for substantially all of the film manufacturing companies of the United States. In connection with said casual employment plaintiff from time to time made trips to various towns and cities located in Eastern Washington and Northern Idaho where he checked attendance at various motion picture theaters designated by his employer.

"On or about May 13, 1943, the plaintiff received instructions from his employer to check the Bungalo Theater in St. Maries Idaho, on May 16, 17 and 18th following; That plaintiff was not informed by his employer of the purpose of the check, and thereafter on May 16th checked the attendance at said theater from approximately 6:30 P M until 9:30 P M when he returned to his home. That again on May 17th and 18th the plaintiff checked the attendance at said theater during the same hours. That said check of attendance consisted solely of counting the number of patrons purchasing admission tickets to said theater on a tallying clock.

"As plaintiff was preparing to leave St. Maries, Idaho, on May 18, 1943, after completing said check, plaintiff was accosted by two men, whom plaintiff believes to be police officers, who questioned him concerning his business in St. Maries, and after said questioning, advised him to leave and not return. That plaintiff believes and therefore alleges that said police officers were directed by the defendant Cook to thus accost him and order him to leave town. That the defendants A. M. Quane and wife published in the May 20, 1943 issue of said St. Maries Gazette-Record a libelous attack entitled 'A New Deal Stoolpigeon', which article was signed 'Bungalo Theater, Fulton Cook.' That said libelous article is attached hereto, marked Exhibit 'A' and by this reference made a part hereof as fully as though set forth herein. That thereafter said newspaper was distributed to all of the regular subscribers and copies of editor's issue were sent by mail to the Mayor and, as plaintiff believes, to members of the City Council of Oakesdale, where plaintiff resides."

The article complained of is as follows:

"A New Deal Stoolpigeon"

"On Monday evening the cashier of the Bungalo Theater was informed, by one of our local business men, that someone was keeping watch on the theater and had done so two nights in succession. He had stationed himself in the Pastime Beer Hall across the street from the theater and had

stood in the window more than two hours each night Sunday and Monday. The informer stated that he did not know what the intentions were of this Picket, but he was sure he was keeping his eye on the theater and, apparently counting all those who were going into the theater.

"The management informed the Chief of Police and on Tuesday evening the Chief of Police, Mr. Gaskill and his assistant Mr. Beaton, caught up with this Peeping Tom and placed him in custody. Upon Examination he stated that he was employed by one of the large film companies to make a report on the theater. He gave his name as Ralph V. Browder, Postmaster of Oakesdale, Washington. He did not give the name of the film company he was stoolpigeoning for. He had been here Sunday, Monday and Tuesday night and admitted that he was doing this work in other parts of the country, as well as St. Maries.

"Now the good people of Oakesdale, Washington must be proud to have their honored Postmaster, who is drawing his check from the taxpayers to be Postmaster of their fair city, to be engaged as a stoolpigeon to picket and obtain information about a privately owned business in a neighboring town, in another state, which he will furnish to some monopolistic film Company, whose desire is to control all theaters and make the patron pay more admission charges, so they can take out of the town a little more money.

"We wonder what the Postal Department would think of one of their prize New Deal appointees to the Postmastership of Oakesdale, being a Jekyll and Hyde, whereas he is a postmaster in Oakesdale and a stoolpigeon in St. Maries. It would hardly seem that the Postal Department would carry such a man on the public payroll and have him in the position in Oakesdale, Washington. We do not believe that the public as a whole would feel inclined to favor an appointment of a character of this kind to the position of Postmaster in any town.

"We did not know that we had reached the stage where New Deal Gestapo is spying on their neighbors, like they are doing in Germany. If this is the case, how long will it be before such stoolpigeons will be spying on homes and turning in the information to those desiring such. Yours very truly, Bungalo Theater, Fulton Cook."

Plaintiff alleges that this article contained the following statements, which statements and each of them are untrue, libelous and defamatory: "The Chief of Police * * * caught up with this Peeping Tom and placed him in custody." "He did not give the name of the film Company he was stoolpigeoning for." "The good people of Oakesdale, Washington, must be proud to have their honored postmaster * * * to be engaged as a stoolpigeon." "We wonder what the Postal Department would think of one of their prize New Deal Appointees . * * · * being a Jekyll and Hyde * * * Postmaster in Oakesdale * * * Stoolpigeon in St. Maries." "The Postal Department would carry such a man on the public payroll." "That the public as a whole would feel inclined to favor an appointment of a character of this kind to the position of Postmaster in any town." "New Deal Gestapo is spying on their neighbors, like they are doing in Germany." "How long will it be before such stoolpigeons will be spying on homes."

"That said publication by virtue of its wide circulation and by reason of the further fact that copies thereof were sent to prominent residents of Oakesdale, Washington, who were not regular subscribers thereto, has excited wide-spread prejudice against the plaintiff and that said article and publications were maliciously and deliberately calculated to excite prejudice and with intent to injure him in his business and occupation and to ruin his good name and reputation for honesty, integrity and virtue and thereby expose him to public hatred, contempt and ridicule and cause his dismissal from the postal service; that said false, libelous and defamatory statements were all made with an utter disregard for the truth and verity and for the sole purpose of injuring plaintiff in his good name and in his occupation, and by reason of the acts and things hereinbefore set forth plaintiff has been damaged in his good name and reputation in the sum of Twenty-five Thousand ($25,000) dollars."

Motions have been submitted as follows: First, by defendants A. M. Quane and Mrs. A. M. Quane moving the court to dismiss the above entitled action because the complaint fails to state a claim against said defendants or any of said defendants upon which relief can be granted. Second, defendant Fulton Cook moves the Court for an order dismissing the complaint on the following grounds: "First, the said complaint does not state facts sufficient to constitute a cause of action against this defendant and fails to state a claim against

defendant upon which relief can be granted. Second; that there is a defect of parties defendant. Third; plaintiff's alleged cause of action fails to state facts from which it can be determined wherein or whereby he suffers damages in the amount claimed or in any amount whatsoever." Third, defendant Mrs. Fulton Cook moves the Court for an order dismissing the complaint on the same grounds. Fourth, defendant Bungalo Theater moves the Court for an order dismissing the complaint on the same grounds.

There are additional motions filed by defendant Fulton Cook, Mrs. Fulton Cook and Bungalo Theater to make the complaint more definite and certain and to strike and although they have filed separate motions they are identical and the grounds of the motions are as follows: "First; by setting out in detail the elements and items of damage claimed to have 'been suffered by plaintiff to the extent of $25,000 or any other amount and setting out in detail all matters constituting or claimed to constitute such damages. Second: The setting out in detail what part of the $25,000 damages has been suffered by plaintiff, if any, in his good name and in his occupation and what part of the damages is suffered by reason of his occupation and what part by reason of his good name; further showing detail of what plaintiff's damages consist. Should said motion be denied, defendant asks for an order requiring the plaintiff to furnish defendant a bill of particulars. Third: Defendant further moves for an order requiring the plaintiff to state whether or not he is suing the Bungalo Theater as a trade name or whether he is suing alleged individuals constituting said Bungalo Theater. Fourth: That the following matter be struck from the complaint as redundant and immaterial matter:—(a) All of paragraph six of the complaint, beginning with the word, as, in the first line and ending with the word, town, in the sixth line of said paragraph. (b) All of paragraph seven of said complaint. (c) That part of paragraph eight beginning with the word, that, in line one of the last page, and ending with the word, occupation, in line four of the last page."

These motions have been presented to the Court under rule 18 of the Rules of this Court.

As to the motions to dismiss it is urged by counsel for defendants that none of the matters contained in exhibit 'a' are libelous per se, and that no facts are set forth in the complaint that render the statements contained therein libelous per se, and counsel contend the complaint shows upon its face that the matter set forth in the publication is of public interest, that is, it deals with one discharging a public function, and is privileged or at least quasi privileged, and that where quasi-privileged publications are involved express malice must be alleged.

The first question to be considered by the Court is: are the matters set forth in exhibit "a" libelous per se?

The only Idaho Statute defining libel is section 17-1501, Idaho Code Annotated, which provides as follows:

"Libel defined.—A libel is a malicious defamation, expressed either by writing, printing, or by signs or pictures, or the like, tending to blacken the memory of one who is dead, or to impeach the honesty, integrity, virtue or reputation, or publish the natural or alleged defects, of one who is alive, and thereby to expose him to public hatred, contempt or ridicule."

Section 17-1503 of the same chapter provides:

"Malice Presumed.—An injurious publication is presumed to have been malicious if no justifiable motive for making it is shown."

This article appears more or less as a political tirade resorted to very often by writers in describing acts of those who might be of a political faith different from the writer, particularly where they are connected with the administration. It is quite doubtful whether such articles are taken very seriously by the reading public. Writers and speakers are daily boasting of the freedoms given us by the Constitution and laws of our land, and among these freedoms are Free Speech and Free Press, and as said by the Honorable William A. Lee of the Supreme Court of the State of Idaho, in the case of Jenness v. Co-Operative Publishing Company, 36 Idaho 697, at page 702, 213 P. 351, at page 353: "The article is an exemplification of a form of caricature that frequently appears, but in a more approved and refined form, in the current newspapers of the day, whereby they attempt to emphasize and set forth the shortcomings of men prominent in public life, or political parties, or reform movements against which the writer is seeking to create an adverse public opinion. Many of these writings and cartoons appearing in the public press are

often useful in creating and directing public opinion toward needed reforms or the suppression of evil. If the law should hold all this class of articles, whether by pictures or writing, actionable per se, without a showing of malice or pecuniary loss to the party alleged to have been injured, it would so effectually restrain the press and tend to prevent it from giving the needed publicity to matters of vital importance to the public welfare that it would greatly impair one of the most potent influences for good we have, for all experience shows that there is no power so great in suppressing wrong as its pitiless exposure in the public press."

Recognizing and approving the rule as announced by Judge Lee in this opinion, there is something else that must be remembered; "a good name is rather to be chosen than great riches, and loving favor rather than silver and gold", every one cherishes the love and respect of their neighbors and friends. A man who has a good character has something that is more valuable to him than silver or gold. When he loses his earthly wealth, if he still retains his good name, it goes with him to the end of life as a comfort and shield against the attacks of those who would injure him and it is a solace and comfort to him as he nears the end of life's highway that he will leave that good name as an inheritance to his family after he is gone.

■ So in passing on this published article we must consider both sides of an important question; the freedom of the press on the one hand and a man's good name on the other. There must be a dividing line. The freedom of the press must not be impaired, but that freedom, if the freedom of the press is to survive, must not go so far that they can use the power of the press in violation of the rights of the individual, that he might be injured in his good name, office or profession, or held up to the ridicule, hatred or scorn of his fellow men.

■ If the article here before the Court would do so, the injurious character of the publication would be presumed and would necessarily import damages so that special damages need not be pleaded or proved. Jenness v. Co-Operative Publishing Company, supra, 36 Idaho at page 703, 213 P. 351.

■ It is well settled that a newspaper has no more right by reason of the fact that it is a newspaper than any individual would have to injure any citizen by charges against his good name. In fact, a news-

paper has a greater opportunity to cause damage by reason of its wide circulation, than a private individual would have, and is a greater reason for the publishers to exercise care in not unjustly injuring any one.

It is contended by the defendants that the matters set forth in this publication are of public interest; that it deals with one discharging a public function, and is privileged or at least quasi privileged. Section 17-1507, Idaho Code Annotated, provides:

"Report of public proceeding.—No reporter, editor, or proprietor of any newspaper is liable to any prosecution for a fair and true report of any judicial, legislative, or other public official proceedings, or of any statement, speech, argument, or debate in the course of the same, except upon proof of malice in making such report, which shall not be implied from the mere fact of publication."

This is the only statute of the State of Idaho providing for privileged publications, and while the Legislature was considering what should be privileged, it is fair to presume they did not intend to go farther in granting such privilege than was covered by this provision of the statute. However, without taking this statute into consideration, and interpreting this publication as governed by the common law, is it a publication respecting political affairs that will bring it within the rule?

■■ In the instant case the plaintiff is a post master; he is not elected by the public; he presumably is under the civil service law. I have found no authority holding that any libel is privileged as to a man in his position except where complaint was made to the proper authority, without malice (in this case the Postmaster General or some one in authority connected with the administration of the postal department). The complaint in this case alleges that "this article was not only published and through such publication sent to their regular subscribers and others who might read it, but copies were sent to prominent residents of Oakesdale, Washington, who were not subscribers." Such action would indicate malice. The complaint also alleges: "that said article and publication were maliciously and deliberately calculated to excite prejudice and with intent to injure him in his business and occupation and to ruin his good name and reputation for honesty, integrity and virtue and thereby expose him to public hatred, contempt and ridicule and cause his

dismissal from the postal service." Malice being pleaded in the complaint, it should be left to the determination of the jury under the evidence.

■ The article does not come under the common law rule and is not a privileged or quasi privileged communication, nor is it made so by statute of the State of Idaho.

We now turn to the contents of the article itself. Is it libelous per se?

If it is a publication containing charges tending to impeach the honesty, integrity, virtue or reputation of the plaintiff or to expose him to public hatred, contempt or ridicule, then it is libelous per se. We will look at those parts of the article referring to the plaintiff, of which he complains:

(a) "The Chief of Police * * * caught up with this Peeping Tom and placed him in custody."

(b) "He did not give the name of the film company he was stoolpigeoning for"

(c) "The good people of Oakesdale, Washington, must be proud to have their honored Postmaster * * * to be engaged as a stoolpigeon"

(d) "We wonder what the Postal Department would think of one of their prize New Deal appointees * * * being a Jekyll and Hyde * * * Postmaster in Oakesdale * * * Stoolpigeon in St. Maries"

(e) "The Postal Department carry such a man on the public payroll"

(f) "That the public as a whole would feel inclined to favor an appointment of a character of this kind to the position of Post master in any town"

(g) "New Deal Gestapo is spying on their neighbors like they are doing in Germany."

(h) "How long will it be before such stoolpigeons will be spying on our homes"

■ Before this publication can be held libelous per se it must appear that the words complained of, standing alone, without the aid of extrinsic evidence, would tend to injure the plaintiff as hereinbefore specified.

Section 17-1501, Idaho Code Annotated, defining libel, is very broad and includes any language which upon its face has a natural tendency to injure a person in any of the particulars mentioned.

■■ It is well settled that in the determination of this question, the alleged libelous publication is to be construed "as well from the expression used as from the whole scope and apparent object of the writer" and in passing we might consider, what was the object of the writer in going outside his regular subscribers and sending copies of the article to the others mentioned in plaintiff's complaint. Unexplained, it would appear there could be but one purpose, that was to injure the plaintiff in his home town, it certainly could not be construed as giving him a character recommendation that would help his standing among the readers of the article.

■ The motion to dismiss can only be sustained when the words published are privileged or when they are not libelous per se under any reasonable construction.

It is ably contended by counsel for the defendants that the article is not libelous per se, that there is no statement in the article which impeaches the honesty, integrity or reputation of the plaintiff or any natural or alleged defects of the plaintiff; that it only criticizes in rather strong terms of disapproval certain activities which are admitted in the complaint and only ridicules the nature of plaintiff's activities at St. Maries.

To say that it only criticizes in strong terms is putting it rather mildly. He is referred to as a Peeping Tom who was placed in the custody of the police. Peeping Tom is a name that is generally pretty well understood as a person who makes it a habit of sneaking up to windows and peeping in, for the purpose generally of seeing the women of the household in the nude. Counsel for defense have not advised the Court of their understanding of the meaning of the word, it might refer to a person as one prying into other people's affairs, it might have a different meaning to different readers. The fact that the article says that the plaintiff was placed in custody, the readers might say in commenting on the article that he was placed in jail. The definition given by the dictionary is: "a keeping; guardianship; the state of being held in keeping or under guard; restraint of liberty; imprisonment." It gives "fetter" as a synonym. Stoolpigeon is a very common term but not considered complimentary in any sense of the word. It is used frequently about officers of the law who act as spies in apprehending criminals; it is referred to as a "come-on" man who entices others into houses of ill fame or gambling houses. It is well understood in the legal profession that Courts will not permit officers of the

law who are called to testify to be referred to as stoolpigeons,—it is a fighting word.

As to the alleged charge that he was a Jekyll and Hyde; this is a term used frequently and likens the person accused of being a Jekyll and Hyde, to a dual personality depicted in the play or story of Jekyll and Hyde; one the model citizen and professional man; the other a sinister, evil character.

Referring to the plaintiff as a "New Deal Gestapo spying on their neighbors, like they are doing in Germany." This country being at war with Germany, hating all that Hitler and his Government stands for, this statement might be understood to be a serious charge. The Court cannot enlarge or restrict the meaning of any of the words or statements included in this article beyond their ordinary meaning.

As the Court mentioned in the first part of this opinion, this article appears more or less, to the Court, as a political tirade. The Court is unable to say how the general public would interpret it. It is possible that the plaintiff overestimates it; that the hurt is more personal to him than injuring him in the eyes of the public. I am sure that no one, including the defendants, would want such an article published about them, and if such charges were published about them that it would grievously hurt their feelings.

The defendants, as urged by counsel, may not have intended in the publication of the article to impeach the honesty, integrity, virtue or reputation or to expose him to public hatred, contempt or ridicule (Section 17-1501, Idaho Code Annotated), but that is not the question. The question is, what in fact was charged and what the public who reads the article might reasonably suppose was intended. The rule is:

" 'Not only is the language employed to be regarded with reference to the actual words used, but according to the sense and meaning, under all the circumstances attending the publication, which such language may fairly be presumed to have conveyed to those to whom it was published; so that in such cases the language is uniformly to be regarded with what has been its effect, actual or presumed, and its sense is to be arrived at with the help of the cause and occasion of its publication. And in passing upon the sufficiency of such language as stating a cause of action, a court is to place itself in the situation of the hearer or reader, and determine the sense or meaning of the language of a complaint for libelous publication according to its natural and popular construction.' That is to say, the publication is to be measured, not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural and probable effect upon the mind of the average reader." Bates v. Campbell, 213 Cal. 438, 2 P.2d 383, 385.

"A publication claimed to be defamatory must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it. So the whole item, including display lines, should be read and construed together, and its meaning and signification thus determined. When thus read, if its meaning is so unambiguous as to reasonably bear but one interpretation, it is for the judge to say whether that signification is defamatory or not. If, upon the other hand, it is capable of two meanings, one of which would be libelous and actionable and the other not, it is for the jury to say, under all the circumstances surrounding its publication, including extraneous facts admissible in evidence, which of the two meanings would be attributed to it by those to whom it is addressed or by whom it may be read." Lane v. Washington Daily News, 66 App.D.C. 245, 85 F.2d 822–824.

To determine whether this article is libelous per se the Court must place itself in the position of the reader. Examining the whole publication from this standpoint, the Court is of the opinion that it is libelous per se, and arrives at this conclusion because it cannot be said from a careful study that it could not reasonably be understood to presumably occasion damage to the person about whom it is written.

The complaint is not subject to dismissal; the objections raised on the motion as to sufficiency of the complaint are matters of defense and should be left to the jury under proper instructions, Dwyer v. Libert, 30 Idaho 576, 167 P. 651, Ann.Cas. 1918B, 973.

We next consider the motion to dismiss as to defendants Mrs. Fulton Cook and Mrs. A. M. Quane. Are they properly made parties defendants? The complaint alleges as to Mrs. Fulton Cook: "Defendants Fulton Cook and Mrs. Fulton Cook, whose true Christian name is to plaintiff unknown, are now and have been at all the times hereinafter mentioned husband and

wife, constituting a marital community under the laws of the State of Idaho; that said defendants are now and have been at all the times hereinafter mentioned residents of St. Maries, Benewah County, State of Idaho, and are engaged in business in said county operating among other businesses, a motion picture theater known as the Bungalo Theater of St. Maries, Idaho. That all of the acts and conduct hereinafter described and alleged were done by the defendant Fulton Cook while engaged in the business affairs of the community and were for the use and benefit of said community."

It is unnecessary to set out the allegations as to Mrs. A. M. Quane as the allegations regarding her are generally the same. Their connection with their husbands is alleged to be a "marital community". Section 31-913, Idaho Code Annotated provides in part: "Husband's control of community property.—The husband has the management and control of the community property, except the earnings of the wife for her personal services and the rents and profits of her separate estate * * *."

The statute gives the husband complete dominion of the community property except for the limitations imposed by statute. (It is not necessary to list these limitations as they do not apply in the instant case.) It has been well settled under the laws of the State of Idaho that the wife is not personally responsible for the debts of her husband, and in order to charge her personally, facts must be alleged and proved that the debt was incurred for the benefit of her separate property or was contracted by her for her own use and benefit. McFarland v. Johnson, 22 Idaho 694, 127 P. 911.

It is therefore incumbent upon a plaintiff in bringing an action to not only allege the facts making the married woman responsible, but also to allege the estate either separate or community chargeable with the debt, and if it is the intention to hold the community property liable the wife should not be joined, unless a different rule is made where the action be based on tort, and the Court is unable to find any reason for so holding.

The complaint in this case is silent as to these defendants except to say that there is a marital community interest in the business, it does not allege commission of the tort, whether she committed it independent of her husband, whether she was present when it was committed and if she was there is no allegation negating the presumption of the husband's coercion. The husband both as to Mrs. Cook and Mrs. Quane had entire management and control of the business. The wives had no control whatever. They are not liable under the averments of the complaint. Under Rule 21 Rules of Civil Procedure, 28 U.S.C.A. following section 723c, these parties should be dropped unless the complaint is amended in accordance with the views herein expressed.

There is the objection to the complaint that it cannot be ascertained whether the suit is against the Bungalo Theater and the St. Maries Gazette-Record or the individuals named. There is no ground for this contention. It is required by chapter 5 of the Idaho Code Annotated, § 52-501 et seq., that no person or persons shall carry on a business under an assumed or fictitious name without filing in the office of the recorder of the County in which such business is to be conducted showing the real names of the owners or the parties conducting and transacting the business. This statute was no doubt passed primarily for the purpose of protecting persons extending credit and to protect against fraud in not advising the public as to the true names of the owners. It is simply to designate the ownership thereof and does not in anywise change the status of the owner and does not create an artificial person as in the case of a corporation.

The complaint in this case is not against the Bungalo Theater and the St. Maries Gazette-Record but against the individuals doing business under the assumed names.

As to the motions to make the complaint more definite and certain and to strike, and for a bill of particulars. The allegations of the complaint are sufficient to advise the defendants of the claim for relief, and sufficient to require them to answer. Therefore these motions are denied.

Any information that counsel desire, to which they are entitled, can be obtained under the liberal rules of discovery of the rules of civil procedure.

The matters asked to be stricken are not over-important to the claim for relief and the question of striking them will be considered at the time of the trial on its merits.

Order will be entered in accordance with the views herein expressed.