GOVERNMENT OF THE VIRGIN ISLANDS, Plaintiff

v.

AUSTIN STAGGER, JR., Defendant

Criminal No. 253/1976

Territorial Court of the Virgin Islands

Div. of St. Thomas and St. John

March 15, 1977

LEONARD FRANCIS, ESQ., Deputy Assistant Attorney General (Department of Law), *for plaintiff*

ALLAN SMITH, ESQ., Public Defender, St. Thomas, V.I., *for defendant*

FEUERZEIG, *Judge*

### MEMORANDUM AND JUDGMENT

This case came on for trial on January 31, 1977, and presents the basic question of whether a "Peeping Tom" violates the Virgin Islands disturbing the peace law. The Defendant, Austin Stagger, Jr., appeared with counsel and pleaded not guilty to the charges of disturbing the peace, 14 V.I.C. § 622(1), and criminal trespass, 14 V.I.C. § 1741.[1]

The Government presented its case through the sworn testimony of Linda Theresa Charles, Nathaniel Wells, and

---

[1] Defense counsel stated that on December 13, 1976, Count I of the complaint, the disturbing the peace charge, was dismissed by the Government. The Court's records and stenographer's notes having failed to substantiate this, the Court had no choice but to proceed to trial on both counts.

Joyce Birmingham. At the close of the Government's case, the Defendant moved for a judgment of acquittal, which motion was taken under advisement. The Defendant rested without offering any testimony, and closing arguments of counsel were heard.

The Court finds beyond a reasonable doubt that the Defendant, Austin Stagger, Jr. was present in the vicinity of Hospital Line 17A & B on November 7, 1976. In fact, on that evening, the Defendant was located on the third floor of an apartment building adjacent to and immediately south of Hospital Line 17A & B. The uncontroverted testimony of Linda Charles establishes that she resided with her mother, Joyce Birmingham, on the third floor of the Hospital Line building, and that their bedroom was fitted with glass louvered windows opening to the south. On the evening in question, while on her way home, Ms. Charles spotted a figure standing on the ledge on the third floor of the adjacent building, peeping into a lighted room occupied by her mother. Ms. Charles immediately went upstairs and entered her mother's room, where Ms. Birmingham was asleep. Ms. Charles whispered in her mother's ear that "he is here again" or words to that effect. Shaken and apparently frightened by the Defendant's presence, Ms. Charles hurried to a nearby police cruiser, which combed the immediate vicinity, located the Defendant, and placed him under arrest in the presence of Ms. Charles. Ms. Birmingham, as soon as she became aware of the Defendant's presence outside of her room, became frightened, agitated, upset and angry. She immediately got up and went into the living room of her apartment.

Nathaniel Wells, the owner of the building where Ms. Charles and Ms. Birmingham reside, testified that his building is flush against the property line on the south, and that the adjacent building on which the Defendant was located is three to four feet away, but that it contains a concrete ledge on the third floor that makes it closer to his

236

building at that point. Nathaniel Wells' testimony, as that of Ms. Charles and Ms. Birmingham, was uncontroverted. Both women indicated that the Defendant had been a disturbance to them since August of 1975 and that they had no difficulty recognizing or identifying him as the man on the ledge outside their room on the evening in question.

## COUNT I—DISTURBING THE PEACE

Despite all of the foregoing, before the Court can conclude that this Defendant is guilty as charged, it must resolve two issues of statutory construction. Count I of the complaint charges that the Defendant "maliciously and willfully did disturb the peace of said Linda Charles by tumultuous offensive conduct, to wit: by peeping into the bedroom window of Ms. Charles and her mother, Joyce Birmingham, all in violation of 14 V.I.C. § 622(1)." 14 V.I.C. § 622(1) applies to:

Whoever maliciously and wilfully—

(1) disturbs the peace or quiet of any village, town, neighborhood or person, by loud or unusual noise, or by tumultuous offensive conduct, or threatening, traducing, quarrelling, challenging to fight or fighting; ...

Clearly, there was no showing of the presence of "loud or unusual noise" or of the Defendant's "traducing, quarrelling, challenging to fight or fighting." The Court does find that the Defendant's conduct was clearly upsetting and frightening to Linda Charles and Joyce Birmingham. The testimony of the two women establishes that the Defendant was a "Peeping Tom" as the term is generally understood, "a person who makes it a habit of sneaking up to windows and peeping in, for the purpose generally of seeing the woman of the household in the nude." Browder v. Cook, 59 F.Supp. 225, 231 (D. Idaho 1944). The question, however, is whether this behavior is "threatening" or "tumultuous offensive conduct." Despite a request that counsel submit

memoranda to assist the Court in resolving this question, neither has done so.

The closely related offense of disorderly conduct or breach of the peace has been held to include windowpeeking, and the conduct this Court finds the Defendant to have committed. Carey v. District of Columbia, 102 A.2d 314 (Mun. Ct. App. 1953) ; see Butts v. State, 97 Ga. App. 465, 103 S.E.2d 450 (1950). In Butts, the Georgia Code made it unlawful to "go about or upon the premises of another for the purpose of becoming an eavesdropper or a 'Peeping Tom,'" which was defined as one "who peeps through windows or doors, or other like places, on or about the premises of another, for the purpose of spying upon or invading the privacy of the persons spied upon."

Carey held that peeping in the window of an occupied, lighted apartment at 1:30 in the morning constituted disorderly conduct within the meaning of the District of Columbia statute which provided:

(a) Whoever, with intent to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned thereby—

(1) acts in such a manner as to annoy, disturb, interfere with, obstruct, or be offensive to others.

The Municipal Court of Appeals for the District of Columbia recognized that since a penal statute was involved, it must be strictly construed, and concluded:

[W]e feel that the defendant's conduct constituted disorderly conduct within the meaning of the statute and that it would be absurd to hold otherwise. Such conduct would tend not only to disturb and to be offensive, but would outrage the sense of decency of others. What action could be more disturbing, offensive, or insulting than to have a total stranger peeping into the window of one's lighted apartment, especially at 1:30 in the morning? 102 A.2d at 315.

This Court agrees that the acts of the defendant herein likewise were disturbing, offensive and insulting to both Ms. Charles and Ms. Birmingham, but in the statute at

issue we do not find language similar to the District of Columbia or Georgia statutes that were involved in Carey and Butts.

■ Carey might be dispositive of this case if the word "tumultuous" was not included in front of "offensive conduct" in 14 V.I.C. § 622(1). The Fourth Circuit had occasion to consider the meaning of tumult in a case attacking the constitutionality of a South Carolina statute embodying the phrase, "tumultuous disturbance of the peace." In upholding the constitutionality of this phrase against a claim of vagueness, the Court noted that "tumult" is defined by Webster as a "disorderly agitation or milling about of a crowd, usually with uproar and confusion of voices." Circuit Judge Craven reasoned, "To the man on the street, we think a 'tumultuous disturbance of the peace' clearly connotes noisy conduct of some sort . . ." Abernathy v. Conroy, 429 F.2d 1170, 1175 (1970). I cannot regard Mr. Stagger's conduct as falling within this definition.

■ "Threatening," however, suggests some danger at hand even though it is not imminent. In fact, in some instances, a threat need not ever be communicated directly to the threatened individuals. Gurley v. United States, 308 A.2d 785 (D.C. Ct. App. 1973). The word connotes menace. State v. Lizotte, 256 A.2d 439 (Me. 1969). To constitute a "threat" under a breach of peace statute, there need not be "an immediate menace of violence or acts showing a present ability and will to execute the threat. That would liken the threat to an assault, which is and always has been a separate offense under our statute and distinct from a threat. A threat imports the expectation of bodily harm, thereby inducing fear and apprehension in the person threatened." State v. Boyer, 198 A.2d 222, 225 (Cir. Ct. Conn. 1963). Although Lizotte, Boyer and Gurley are factually distinguishable from the case sub judice, they do offer sufficient guideposts for interpreting our statute.

239

Lizotte involved a defendant's verbal threat to an officer that "When I am done with you, you won't be moving. You have had it, cop. I will get you." This comment was uttered while the defendant was in custody in a police cruiser, having been placed under arrest subsequent to a street brawl during which he struck the officer in the face. Boyer involved the use of vile, abusive and indecent language over the telephone. The caller stated that the person telephoned was going to die and that his house would be burned down. In Gurley, the defendant called the complaining witness on the telephone, and before he could utter the threat, she handed the telephone to a police officer who heard the defendant say, "If you call the police or cause me any trouble, I'm going to kill you, Thelma, and then I'll burn down that God damn apartment." Gurley v. United States, 308 A.2d at 786.

Although the verbal acts in Boyer, Gurley and Lizotte may have involved a more explicit menace than in this case, Mr. Stagger's physical act involved a much more imminent menace. Mr. Stagger's freedom of movement was not encumbered as was that of the arrested defendant in Lizotte, nor was he only in telephone distance of Ms. Birmingham as were the callers in Boyer and Gurley. Mr. Stagger had the apparent ability and possible motivation to enter the premises. This, coupled with the two women's previous encounters, was sufficient to create anxiety and a real threat to both Ms. Charles and Ms. Birmingham.

■ Boyer and Gurley, as in Lizotte, dealt with a verbal act as opposed to the non-verbal physical conduct at issue here. However, 14 V.I.C. § 622(1) attempts to make secure "the peace or quiet of any village, town, neighborhood or person." A person's peace may be disturbed by threatening conduct as well as oral communications, and our statute makes no distinction between them. There is no doubt that a threat may be expressed by acts or conduct as well as by

240

words. People v. Winters, 329 P.2d 743 (4th Dist. Cal. 1958); State v. Bouldin, 456 P.2d 830 (Mont. 1969). In fact, a "threat" has been defined as "any menace of such a nature and extent as to unsettle the mind of the person on whom it operates, and to take away from his acts that free, voluntary action which alone constitutes consent." State v. Hamre, 247 Ore. 359, 362, 429 P.2d 804, 806 (1967).

■■ The Government, therefore, need not establish an assault under 14 V.I.C. § 291(2) to establish threatening conduct under 14 V.I.C. § 622(1), cf. Postell v. United States, 282 A.2d 551 (D.C. Ct. App. 1971), State v. Boyer, supra. Section 291(2) defines an assault as "a threatening gesture showing in itself an immediate intention coupled with an ability to commit a battery." "Threatening" under Section 622(1) does not require the imminence and present ability of a criminal assault. Accordingly, I find beyond a reasonable doubt that Austin Stagger's conduct was threatening within the meaning of 14 V.I.C. § 622(1) and that he is guilty of disturbing the peace as charged.

COUNT II—TRESPASS

■ To make out a case for trespass under 14 V.I.C. § 1741, the Government must prove beyond a reasonable doubt that Austin Stagger entered upon the land of another.[2] Nathaniel Wells' testimony establishes that the wall of his building at 17A & B Hospital Line is contiguous with the property line. Does this coupled with the facts spelled out above demonstrate an entry upon the land of another? Moreover, must the Government prove that the Defendant has in fact gone beyond the property limit involved? Under common law, trespass quare clausum fregit lay for

---

[2] 14 V.I.C. § 1741 declares:
 "Whoever enters upon the land of another without the consent of the owner or of the person in charge thereof, shall be fined not more than $50 or imprisoned not more than 30 days or both."

241

damages for an unlawful entry or trespass upon the plaintiff's land where the defendant broke the plaintiff's "close," that is, the real or imaginary structure enclosing the land. Black's Law Dictionary, 4th Ed. (1968).

 Although the comparison to an archaic form of civil action is not decisive, the Court does believe that the word "entry" anticipates physical penetration, which is not present where a person merely leans upon a building whose outer surface is contiguous with the property line. But the Court need not decide this issue because Linda Charles testified that she was not certain that the Defendant leaned on her building. Her testimony was that she saw him only on the ledge of the immediately adjacent building. The Court, therefore, cannot conclude beyond a reasonable doubt that the Defendant *did*, in fact, lean on the building at 17A & B Hospital Line as charged in the complaint. Consequently, I find the Defendant not guilty of the trespass charge.