Ralph D. **ABERNATHY**, Hosea L. Williams, David Bright, Elijah Pearison and Andrew J. Young, on their own behalf and on behalf of all others similarly situated, Appellants,

v.

John F. **CONROY**, Chief of Police of the City of Charleston, Morris D. Rosen, Corporation Counsel of the City of Charleston, Robert B. Wallace, Solicitor, Ninth Judicial Circuit, State of South Carolina, and Donald B. Barkowitz, Magistrate, Charleston County, their agents, servants, successors and assigns, and all those acting in concert with them or under their direction, Appellees.

No. 13933.

United States Court of Appeals, Fourth Circuit.

Argued May 4, 1970.

Decided July 21, 1970.

Melvyn Zarr, New York City (Jack Greenberg, New York City, Fred Henderson Moore, Russell Brown, George A. Payton, Jr., Charleston, S. C., and Anthony G. Amsterdam, Stanford, Cal., on brief), for appellants.

Joseph C. Coleman, and Robert H. Hood, Asst. Attys. Gen. of South Carolina, and I. M. Goldberg, Asst. Corp. Counsel, City of Charleston (Daniel R. McLeod, Atty. Gen., of South Carolina, Morris D. Rosen, Corp. Counsel, and Henry S. Smythe, Asst. Corp. Counsel, City of Charleston, on brief), for appellees.

Before BOREMAN, WINTER and CRAVEN, Circuit Judges.

CRAVEN, Circuit Judge:

Plaintiffs challenge as facially unconstitutional a parade ordinance of Charleston, South Carolina, and the South Carolina common law of riot. The district court denied their motion for a three-judge court and preliminary injunction and dismissed their complaint. We affirm.

I.

Plaintiffs alleged these facts, which, in the posture of the case, must be taken as true. On June 20, 1969, at about 11:30 p. m., plaintiffs Abernathy, Williams, Bright, and Pearison, officers of the Southern Christian Leadership Conference, assembled at the Memorial Baptist Church in Charleston, South Carolina, with about 250 of their followers. They intended to walk about four blocks to a park and there conduct a prayer vigil. The prayer vigil was to be a protest against racial discrimination in employment at the South Carolina Medical College and the Charleston County Hospital. Plaintiffs had been holding similar peaceful protests for the same purpose throughout the spring of 1969.

On the night in question plaintiffs counseled the persons who met at the church about S.C.L.C.'s nonviolent tradition, and the group set out for the park. The march had proceeded about two blocks when defendant Conroy, the Charleston Chief of Police, told Abernathy to stop the procession. Abernathy complied, and Conroy informed the marchers that they could proceed no farther because they did not have a parade permit. Plaintiffs and their associates had applied for and received permits in Charleston for previous assemblies and processions, but did not apply for one on this occasion because Section 31–195 of the Charleston City Code expressly prohibits the granting of a permit to parade after 8 p. m.[1]

Abernathy asked Conroy whether the group could split up and walk the remaining distance to the park in small groups or singly in order to avoid the prohibition of the ordinance. Conroy told Abernathy that neither he nor any member of his group could continue to the park for the prayer vigil. Abernathy and the others immediately knelt in the street, and Abernathy began leading the others in prayer. Conroy ordered them to stop. Abernathy refused and admonished him not to interrupt the praying.

Three or four policemen then seized Abernathy and carried him to a police vehicle. The police also arrested Williams, Bright, and Pearison. The authorities charged all four men with riot; and at a preliminary hearing on June 21, 1969, a state court ordered them jailed in lieu of $50,000 bond each.[2] The authorities also charged them with parading without a permit.

---

1. Section 31–195. *Limitation on designation of hours in permit.* No permit shall be granted under this subdivision for a parade to convene before 8:00 A.M. or terminate after 8:00 P.M.

2. The state authorities subsequently reduced the bail for each plaintiff to $5,000.

Plaintiffs brought this suit in federal court seeking declaratory and injunctive relief. 42 U.S.C. § 1983 (1964). They contend that Section 31–195 of the Charleston City Code arbitrarily suspends the exercise of a citizen's first and fourteenth amendment rights at 8 p. m. They further contend that the common law offense of riot [3] and S.C. Code § 16–113.1 (1962),[4] which prescribes punishment for various degrees of the common law offense, violate the freedom of speech clause of the first amendment and the due process clause of the fourteenth amendment because of vagueness and overbreadth.

The district court refused to certify the case as appropriate for a three-judge court and refused to grant the relief plaintiffs requested. It is not entirely clear precisely what relief was sought. The prayer for injunction was in general terms asking that the court restrain "the defendants from enforcing the state laws * * *." Unless it was embraced in these general terms, there was no request that the prosecutions pending in the state court be prevented.[5] Since we are advised that there was an agreement to suspend the pending criminal proceedings in the state court until this appeal had been heard and decided, we read the general language of the complaint as not seeking injunctive relief against the threatened prosecutions. Thus we need not consider the impact of 28 U.S.C. § 2283 (1964) (anti-injunction statute).

■ We must also mention another limitation on our consideration of the case. Plaintiffs insistently adhere to their position that they seek only a declaration of the facial unconstitutionality of the parade ordinance and the common law crime of riot as defined in South Carolina. They flatly disclaim any implication from their complaint that the ordinance and riot law, if facially valid, were unconstitutionally enforced against them. Plaintiffs believe the Charleston officials arrested them in good faith because the officials regarded their activities as in violation of the law, not in bad

---

3. Riot, according to the South Carolina Supreme Court, is defined as follows:

> A riot is defined to be a tumultuous disturbance of the peace, by three or more persons assembled together, of their own authority, with the intent mutually to assist each other against anyone who shall oppose them, and putting their design into execution in a terrific and violent manner, whether the object was lawful or not.

State v. Connolly, 3 Rich. 337, 338 (1832).

4. § 16–113.1. *Penalties for instigating, aiding or participating in riot.—*

> A person guilty of riot, or of participating in a riot, either by being personally present, or by instigating, promoting, or aiding the same, is punishable as follows:
>
> (a) If the purpose of the assembly, or of the acts done or threatened or intended by the persons engaged, is to resist the enforcement of a statute of this State, or of the United States, or to obstruct any public officer of this State, or of the United States, in serving or executing any process or other mandate of a court of competent jurisdiction, or in the performance of any other duty; or if the offender carries, at the

time of the riot, firearms or any other dangerous weapon, or is disguised, by imprisonment for not more than five years, or by a fine of not more than one thousand dollars, or by both such fine and imprisonment.

> (b) In any other case, if the offender directs, advises, encourages, or solicits other persons, present or participating in the riot or assembly, to acts of force or violence, by imprisonment for not more than two years, or by a fine of not more than five hundred dollars, or by both such fine and imprisonment.
>
> (c) In any case, not embraced within the foregoing subdivisions of this section, by imprisonment for not more than one year, or by a fine of not more than two hundred and fifty dollars, or by both such fine and imprisonment.

This section shall not be so construed as to prevent the peaceable assembling of persons for lawful purposes of protest or petition.

5. *Compare* Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968), in which injunctive relief was sought against enforcement of the statute "in pending or future criminal prosecutions or otherwise * * *."

faith to harass their exercise of protected expression without any intention of pressing the charges or expectation of obtaining convictions. Therefore, since there is no attempt to bring the case within the doctrine of Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968), this is not a situation in which "a federal court of equity by withdrawing the determination of guilt from the state courts could rightly afford [appellants] any protection which they could not secure by prompt trial and appeal pursued to [the Supreme] Court." 390 U.S. at 620, 88 S.Ct. at 1340. Douglas v. City of Jeanette, 319 U.S. 157, 164, 63 S.Ct. 877, 87 L.Ed. 1324 (1943). Compare Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Wright v. Georgia, 373 U.S. 284, 83 S. Ct. 1240, 10 L.Ed.2d 349 (1963); Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963). Their disclaimer here of bad faith would not, of course, bar the imposition of such a defense in the state court under the general denial of a not guilty plea.

## II.

### A. *The Parade Ordinance*

Plaintiffs contend that Charleston's absolute prohibition of peaceful parades after 8 p. m. violates their right to peacefully assemble and petition the government for redress of grievances. The ordinance is said to extend too far in limiting the exercise of recognized first amendment rights because it makes no accommodation for the need of groups to march after 8 p. m. Plaintiffs claim that working people cannot march if their parades must be concluded before 8 p. m., because these people do not leave work until about 5 p. m., and then must go home, eat supper, attend to their children, assemble for the march, and receive instruction in S.C.L.C.'s nonviolent tradition before the parade can begin. Thus, practical limitations on daytime participation and Charleston's flat prohibition against parades after 8 p. m. arguably work in concert to exclude working people from parades altogether.

Accepting plaintiffs' contentions as true, we nevertheless conclude that the Charleston parade ordinance is constitutional. Peaceful picketing and parading are methods of expression entitled to first amendment protection, but they are methods subject to greater regulation than other forms of expression.[6] This is not because marching as a means of communication differs in constitutional kind from "purer" forms of speech, such as verbal expression,[7] but because unlike verbal expression the form that parading takes more often brings it into competition with legitimate non-speech interests, which the state has a right to protect.[8] When this occurs, accommodation of the competing interests involved often means that the right to parade must yield to reasonable state regulation of time, place, manner, and duration.[9]

The question in this case, then, is whether Charleston has exercised its right to regulate marches "so as not to deny or unwarrantedly abridge the right

---

6. Shuttlesworth v. Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Cox v. New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941); Note, Regulation of Demonstrations, 80 Harv.L.Rev. 1773 (1967) [hereinafter cited as Demonstrations]. *See* Gregory v. Chicago, 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969).

7. *See* Kalven, The Concept of the Public Forum: Cox v. Louisiana, 1965 Sup.Ct. Rev. 1, 23–25 [hereinafter cited as Public Forum]; Note, Symbolic Conduct, 68 Colum.L.Rev. 1091 (1968) [hereinafter cited as Symbolic Conduct].

8. *See* Public Forum, *supra*, note 7 at 26; Symbolic Conduct, *supra*, note 7; Demonstrations, *supra*, note 6.

9. Shuttlesworth v. Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Cox v. New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1044 (1941); Public Forum, *supra*, note 7 at 25–29; Symbolic Conduct, *supra*, note 7 at 1121–1125; Demonstrations, *supra*, note 6.

of assembly and the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places." [10] In resolving this question we must balance the inconvenience of forcing plaintiffs and their followers to parade only on weekends and late daylight hours against the interests of Charleston in limiting parades to the hours between 8 a. m. and 8 p. m. We see Charleston's interests as substantial.

The evening is traditionally a time of repose, when people retire to their homes for relaxation. There is a significant state interest in preserving reasonable serenity during this period for the mutual benefit of all citizens.[11] Yet protesters utilize marches precisely because they offer publicity advantages over other means of expression.[12] It is the very purpose of parades to attract public attention,[13] and few parades are so quiet that they go unnoticed. To the extent that they may be noisy there is conflict with the city's interest in preserving peace and good order at night.[14] Restricting parades to daylight hours in order to accomplish this legitimate end is not an unreasonable limitation upon the right of free expression, even if, as a result of the restriction, certain groups are inconvenienced by having to parade on weekends or hurriedly at the end of working days instead of at night.

Another substantial reason for prohibiting night parades is that crime prevention and maintenance of the public safety are more difficult after dark.[15] One who would consider violating the law during a parade might also find psychological comfort in the knowledge that he could more easily evade the authorities after a lawless act committed at night. Conversely, the same person might think twice before acting lawlessly during a daylight parade, since the police could more readily apprehend him. On balance, a prohibition against parades at night reasonably accommodates both free expression and crime prevention by discouraging violence during parades and increasing the authorities' ability to apprehend persons who do violate the law.

 Because we believe there are legitimate reasons for limiting parades to daylight hours, and because Charleston has not unwarrantedly abridged freedom of expression by its method of limitation, we hold Section 31–195 of the Charleston City Code constitutional on its face, as an exercise of power consistent with the governmental prerogative to regulate reasonably the time, place, manner, and duration of parades and marches.

### B. Common Law Riot

Plaintiffs assert that the South Carolina common law definition of riot offends the first and fourteenth amendments because of vagueness and overbreadth. The definition is:

[A] tumultuous disturbance of the peace, by three or more persons assembled together, of their own authority, with the intent mutually to assist each other against anyone who shall oppose them, and putting their design

---

10. Shuttlesworth v. Birmingham, 394 U.S. 147, 155, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969), quoting, Cox v. New Hampshire, 312 U.S. 569, 574, 61 S.Ct. 762, 85 S.Ct. 1044 (1941).

11. Compare Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949), sustaining the validity of an ordinance prohibiting the operation of sound trucks which emit "loud and raucous" noises upon the public streets:
 The unwilling listener is not like the passer-by who may be offered a pamphlet in the street but cannot be made to take it. In his home or on the street he is practically helpless to escape this interference with his privacy by loud speakers except through the protection of the municipality.
 336 U.S. 86–87, 69 S.Ct. 453.

12. See Demonstrations, supra, note 6 at 1773.

13. Id. See also Symbolic Conduct, supra, note 7.

14. See Demonstrations, supra, note 6 at 1774–1775.

15. Id. at 1776.

into execution in a terrific and violent manner, whether the object was lawful or not.[16]

This definition has been substantially adopted by every South Carolina decision we have examined.[17]

Specifically, the plaintiffs object to the definition on the grounds that it: (1) fails to give fair notice of what conduct is prohibited; (2) leaves too much discretion in enforcement to the police; (3) fails to establish an ascertainable standard of guilt; (4) deters the exercise of rights of free expression, peaceful assembly, and petition for redress of grievances; (5) is susceptible of sweeping and improper application trenching upon rights of free expression, peaceful assembly, and petition for redress of grievances; and (6) fails to distinguish between mere advocacy and incitement which creates a clear and present danger of riot.

The vagueness argument centers around two expressions in the common law definition: "tumultuous disturbance of the peace" and "terrific and violent manner." "Tumult" is defined by Webster as a "disorderly agitation or milling about of a crowd, usually with uproar and confusion of voices"; Webster defines "terrific" as "exciting fear or awe"; "violence" is defined as the "exertion of physical force so as to injure or abuse."

■ In our opinion these are not obscure terms. To the man on the street we think a "tumultuous disturbance of the peace" clearly connotes noisy conduct of some sort, and violence is a term with which twentieth century Americans are particularly well acquainted. Although the terms do not facially suggest every species of conduct that may fall within their proscription, the clearest and most precisely drawn laws are also subject to this objection. When the terms are seen in the context of the whole definition, they plainly suggest to the average citizen noisy, frightening conduct accompanied by harmful physical force. Consequently, the common law definition does not prohibit the doing of an act "in terms so vague that men of common intelligence must guess at its meaning and differ as to its application * * *."[18] We hold that the definition satisfies the constitutional test of vagueness.

■ The plaintiffs' objection to the definition on grounds of overbreadth is likewise without merit. A law is too broad under the Constitution when it sweeps within its ambit constitutionally protected behavior.[19] Although plaintiffs assert that the riot definition is susceptible of sweeping application infringing on first amendment liberties, we believe it is not so broad.

If the requirement of a "tumultuous disturbance of the peace" were taken alone, or with only the requirement of "terrific" execution, the crime of riot would clearly extend too far into areas protected by the first amendment.[20] Noisy conduct is not always a proper subject for state suppression, even if it frightens or enrages some people.[21]

---

16. State v. Connolly, 3 Rich. 337, 338 (1832).

17. *See* State v. Johnson, 43 S.C. 123, 20 S.E. 998 (1895); State v. Brazil, Rice 257 (1839); State v. Connolly, 3 Rich. 337 (1832); State v. Cole, 2 McCord 117 (1822).

18. Connolly v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926); Sperber & Solomon, Preserving the ·Peace: Vagueness, Overbreadth, and Free Speech, 3 Law in Trans.Q. 161 (Summer 1966) [hereinafter cited as Preserving the Peace]; Note, The Void for

Vagueness Doctrine in the Supreme Court, 109 U.Pa.L.Rev. 67, 68 (1960).

19. Preserving the Peace, *supra*, note 18 at 165. *See* Thornhill v. Alabama, 310 U.S. 88, 97, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); Note, The First Amendment Overbreadth Doctrine, 83 Harv.L.Rev. 844 (1970).

20. *See* Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963).

21. *Id.*

However, the definition contains another requirement: violence.

An examination of the cases applying the definition to specific facts will illustrate the nature of the violence requirement. In State v. Johnson[22] a jury convicted seven defendants of riot on evidence showing that they were secret society members, who set upon another member of the society, tied him to a tree, and severely whipped him because he had given information to the creditor of a member concerning the whereabouts of certain secreted property.

In State v. Brazil[23] the South Carolina Supreme Court affirmed the convictions of seven men for riot. The evidence was that on three separate nights a band of eight or ten disguised men paraded through the streets of a city from 9 p. m. until after midnight shooting guns, blowing horns, and arousing people from their sleep in a state of terror by firing the guns in the streets near houses. The following passage from the court's opinion is instructive on the manner in which the several elements of common law riot must coalesce to constitute the offense:

> But a man may lawfully pull down his own house in a tumultuous manner and with a great concourse of people, yet if it be accompanied by no circumstances calculated to excite terror or alarm in others, it would not amount to a riot—so also if a dozen men assemble together in a forest and blow horns or shoot guns, or such acts, it would not be a riot. But if the same party were to assemble at the hour of midnight, in the streets of Charleston, or Columbia, and were to march through the streets crying fire, blowing horns, and shooting guns, few, I apprehend, would hesitate in pronouncing it a riot, although there might be no ordinance of the city for punishing such conduct. And why? Because such [violent] conduct in such a place is calculated to excite terror and alarm among the citizens.[24]

In State v. Connolly[25] the defendants ran their boat afoul of another in order to prevent the other boat from pursuing runaway slaves. The South Carolina Supreme Court affirmed their convictions for riot on those facts. Finally, in State v. Cole[26] a jury convicted three defendants of riot for terrorizing a plantation —i. e., beating slaves, threatening the plantation owner by word and weapon, discharging guns, and breaking into slave quarters. The appellate court again affirmed their convictions.

■■ In all of these cases there was violence. Thus, it is clear that there can be no valid conviction for riot under South Carolina law without violence, and it is axiomatic that violent acts are not accorded protection under the first amendment, even though they also constitute expressive or communicative conduct.[27] Moreover, it is self-evident that the state has a legitimate interest in protecting the persons and property of its whole citizenry from the violence of a few. No balancing test is necessary. South Carolina may absolutely proscribe violent conduct. It is, therefore, consistent with the overbreadth doctrine for South Carolina to forbid violent activity that is also noisy and frightening. We hold that the South Carolina common law definition of riot is not overbroad and does not infringe upon activities protected by the first and fourteenth amendments.

22. 43 S.C. 123, 20 S.E. 998 (1895).

23. Rice 257 (1839).

24. Rice at 260 (1839).

25. 3 Rich. 337 (1832).

26. 2 McCord 117 (1822).

27. *See* Symbolic Conduct, *supra*, note 7 at 1121–1125. We note that violence may appear in a more subtle form than force which physically injures or endangers either persons or property. *See* McWilliams, On Violence and Legitimacy, 79 Yale L.J. 623 (1970). We use the term violence as it is normally thought of— *i. e.*, "execution of physical force so as to injure or abuse [persons or property]." Webster's Seventh New Collegiate Dictionary.

III.

For the reasons given in section II we think the facial attack on the common law definition of riot was insubstantial. Moreover, in Heard v. Rizzo [28] a Pennsylvania three-judge court refused to hold the Pennsylvania common law definition of riot unconstitutional on grounds of vagueness. The Pennsylvania crime was defined as

[A] tumultuous disturbance of the peace by three or more persons assembled and acting with a common intent; either in executing a lawful private enterprise in a violent and turbulent manner, to the terror of the people, or in executing an unlawful enterprise in a violent and turbulent manner.[29]

The similarity between the Pennsylvania and South Carolina definitions is apparent, and affirmance of the *Heard* result by the Supreme Court on appeal is another persuasive reason for concluding that plaintiffs' facial attack on the constitutionality of the South Carolina definition was completely without substance. Since a three-judge court is not required where a constitutional claim is wholly insubstantial, either because of prior decisions foreclosing the question asserted or otherwise,[30] the district judge's refusal to certify the case as appropriate for a three-judge court must also be affirmed.[31]

Affirmed.

28. 281 F.Supp. 720 (E.D.Penn.1968), affirmed, 392 U.S. 646, 88 S.Ct. 2307, 20 L.Ed.2d 1358 (1968).

29. 281 F.Supp. at 740.

30. *E. g.*, Swift and Co. v. Wickham, 382 U.S. 111, 114–115, 86 S.Ct. 258, 15 L. Ed.2d 194 (1965); Bailey v. Patterson, 369 U.S. 31, 33, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962); Green v. Board of Elections of City of New York, 380 F.2d 445 (2d Cir. 1967), cert. denied, 389 U.S. 1048, 88 S.Ct. 768, 19 L.Ed.2d 840 (1968). *See also* Turner v. Fouche, 396 U.S. 346, 353 n. 10, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970). Because we view the plaintiffs' constitutional claims as insubstantial, we do not reach the questions (1) whether S.C.Code § 16–113.1 (1962) is merely a

penalty statute, severable from the common law definition of riot in such a manner that a three-judge court is unnecessary, *see generally* Heard v. Rizzo, 281 F.Supp. 720 (E.D.Penn.1968), affirmed, 392 U.S. 646, 88 S.Ct. 2307, 20 L.Ed.2d 1358 (1968); and (2) whether an ancient South Carolina statute adopting the common law of England makes the definition of riot a "statute" within the meaning of 28 U.S.C. § 2281 (1964).

31. Determining the validity of the Charleston parade ordinance does not require a three-judge court because only a local ordinance of less than statewide application is involved. *E. g.*, Moody v. Flowers, 387 U.S. 97, 87 S.Ct. 1544, 18 L.Ed. 2d 643 (1967).