**Lewis H. SWORD et al.**
v.
**James W. FOX et al.**
**Civ. A. No. 70-C-26-H.**

United States District Court,
W. D. Virginia,
Harrisonburg Division.

Oct. 5, 1970.

John C. Lowe, Charlottesville, Va., for plaintiffs.

William G. Broaddus, Walter Ryland, Asst. Attys. Gen., of Va., Richmond, Va., for defendants.

### MEMORANDUM

MERHIGE, District Judge.

This action calls into question the extent to which a public institution of higher education may constitutionally restrict and penalize the manifestation of dissent by its students. The issues arise in the context of an application for a declaratory adjudication as to the validity of current college regulations on their face and as to the legality of imposing sanctions on the participants in two campus demonstrations. The plaintiffs, all students at Madison College when suit was filed, have moved the Court for summary judgment in their favor. Madison is a State-run college in Harrisonburg, Virginia.

The defendants are the Dean of Student Services, James D. Fox; the college president, G. Tyler Miller; the Attorney General of Virginia, Andrew P. Miller; an Assistant Attorney General of Virginia, Walter Ryland; and the Rector and two members of the Board of Visitors of the college.

The Court has heard evidence on the plaintiffs' motion for a preliminary injunction, including the testimony of two defendants, Fox and G. Tyler Miller. Also before the Court is the complaint, sworn to by the plaintiffs Rainey and Sword, certain exhibits admitted during the hearing, and an additional affidavit and exhibit filed in response to the plaintiffs' motion.

The Court may grant summary judgment for a party only if the materials on file indicate that there is no dispute as to material facts and one side is entitled to judgment as a matter of law. Fed.Rules Civ.Proc., Rule 56, 28 U.S.C. The successful movant must show, with materials of appropriate evidentiary quality, that every state of facts is excluded save that which entitles him to relief. Adickes v. S. H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

The same standard applies even when oral testimony has been taken. In this case the Court made findings on the basis of testimony adduced at the hearing on preliminary relief. Counsel for the defendants did not consent at that time that the matter be finally determined on the basis of that evidence. Whatever

may be the use to which the testimony and fact findings from that hearing may later be put, see Fed.Rules Civ.Proc., Rule 65(a) (2), 28 U.S.C., at this point the only issue is whether, treating the testimony of each witness as if it were presented in affidavit form, a triable issue of fact exists. 6 Moore's Federal Practice, ¶ 56.11 [1.–8], at 2149 (2d ed. 1966).

■ For the purposes of this motion, the Court treats the complaint, sworn to by Sword and Rainey, as equivalent to an affidavit. In its consideration of the pleading, however, the Court is mindful that, as in its consideration of affidavits submitted on a Rule 56 motion, it may only consider those statements which the affiant would be permitted to put before the Court as testimonial evidence, and must disregard legal conclusions.

The plaintiffs sue on behalf of all Madison College students; on their side the case is a class action; Fed.Rules Civ.Proc., Rule 23(a), (b) (2), 28 U.S.C.

The suit, when first filed, sought injunctive relief from the further application of Rules 1 and 4 of the college's rules concerning demonstrations, and alleged that disciplinary proceedings against certain individual members of the plaintiff class for infractions of these rules had already commenced.

The full text of the Madison College "Regulations on Demonstrations and Peaceful Assembly" is appended to this opinion. These regulations were approved by President Miller and are included in the college handbook. In particular dispute here are the definition of the functions to which the rules pertain, Rules 1 and 4, and a rule requiring demonstrators to disband on order.

A demonstration is considered to be a public manifestation of welcome, approval, protest or condemnation as by a mass meeting, procession, picketing, or occupation of premises. (Exhibitions commonly associated with social or athletic activities are not within the purview of this policy and its supporting regulations.)

1. The demonstration is to be registered with the Office of Student Activities 48 hours in advance.

\* \* \* \* \* \*

4. Demonstrations are forbidden in the areas of the Health Center, inside any buildings and congregating in the locations of fire hydrants. The appropriate areas for demonstrations will be determined at the time of the request.

\* \* \* \* \* \*

When an assembly of students not authorized by the Dean of Student Services, the Dean of Men, or the Deans of Women has been requested to disband by the President or by an officer of the Student Government Organization or Student Government Association, or by a dean or other administrative officer, those students refusing to comply will be subject to immediate suspension.

The plaintiffs' original complaint sought declaratory and injunctive relief against the enforcement of Rules 1 and 4. The Court, after a hearing on May 26, 1970, denied injunctive relief pendente lite, in part because irreparable harm did not then seem imminent and in part out of concern for the development of the college's independent quasi-judicial bodies.

Subsequently, the plaintiffs initiated further proceedings by their "motion for declaratory relief." Therein it is alleged that disciplinary hearings had been conducted by the defendants with the result that certain plaintiffs were barred from continuing their studies at Madison in September. The Court construes the pleading to be an abandonment of injunctive claims, without prejudice to their possible renewal.

Although it is not strictly necessary, on a motion for summary judgment, that findings of fact and conclusions of law be set forth, the Court believes that fairness to the parties requires that the uncontradicted facts and the legal standards which govern its ruling be expressed.

Certain Madison students were prompted, late in April, 1970, to express to the Madison community their dissent from the college's decision not to retain various teaching personnel; the details of their grievance are unimportant.

On Thursday, April 23rd, a meeting in the Blackwell Hall Auditorium and a gathering near Gibbons Hall were held, both of which activities, the parties agree, were conducted in conformity with college rules. Dennis Gregory, a student, registered the outdoor function with the Director of Student Services; the Blackwell Hall meeting space had been requisitioned in advance as well. The meeting was billed in advance as a "free university" or "teach-in" concerning broad issues of campus government.

After these functions a group of the participants decided to move on to Wilson Hall and assembled there at about 11:00 p.m., although prior arrangements for its use had not been made. According to the plaintiff Sword's testimony, about 25 persons were present. It was the group's intention to remain overnight in order to dramatize their concern and to meet with President Miller, whose office is in the building, the next morning. Two or three in the crowd had brought sleeping bags. The rest sat on benches in the lobby or, for lack of seats, sat on the floor. The passages were kept clear, and there was no boisterousness. Most sat and talked, and a few had brought something to read.

At 12:35 a. m. Friday morning, according to the sworn complaint of Sword and Rainey and consistent with Sword's testimony, the defendant Dean James Fox entered and warned the group that they were conducting a demonstration contrary to regulations and would be subject to sanctions provided in the handbook regulations unless they left within fifteen minutes.

Dean Fox's testimony conformed to this account. He stated that he advised those present, adverting to the rules, that they were participating in an unregistered demonstration. The group reacted quietly. Dennis Gregory, according to Fox, stated that they were present as individuals and thought they had a right to be there.

Fox departed, and most of the group left soon after him. The dean returned at 1:15 a. m., according to Sword's account. As he approached Wilson for the second time some persons outdoors in the vicinity called to those within, warning them to come out. Sword was still inside. With him, he said, were seven or eight others. A dog may have been present as well.

Fox brought with him a tape recorder and was accompanied by an administration official who took photographs. The dean announced that a violation of regulations had occurred. Everyone listened courteously. A few minutes later the group left.

On Friday, April 24th, a number of students, including named plaintiffs, sought permission over 48 hours in advance to conduct a "vigil" in Wilson Hall. Dean Fox testified that when this request was referred to him by a member of his staff, he disapproved it and declined to register the function because it would constitute a "demonstration" inside a building, impermissible under Rule 4.

At 8:50 p. m. Sunday night, more than 48 hours after this registration attempt failed, a group of students, among whom was Sword, assembled again in the Wilson Hall lobby. As before, they planned to stay the night and speak with President Miller the next morning about the administration's refusal to rehire certain professors; added to their list of grievances this time was the threat of sanctions against the participants in the vigil of three days before. About fifty persons were inside Wilson Hall, according to Sword, including three professors.

At 9:00 p. m., Sword and Rainey state in the sworn complaint, campus police began "securing" the building. They so advised the occupants and cautioned them that they had five minutes within which to leave. About 25 of the 50 left, and the police proceeded to lock all but a few of the doors.

Dean Fox arrived at 9:29 p. m., announced that an unauthorized demonstration was being held, and stated that students present would be subject to disciplinary action including suspension and nonstudents might be arrested. He gave them fifteen minutes to leave.

The group was courteous toward Fox. Some inquired why the building was being locked; he replied that it was on account of their presence. As before, some sat on the floor, but hallways were not blocked. The group was fairly quiet and peaceful. One professor advised everyone to be orderly. Sword passed out ashtrays, and someone else swept the floor. One person had brought a guitar; Sword had a flute, and about half the group joined in some folk songs.

Forty minutes after his first visit Fox returned and advised the group, which numbered 27, that they were then subject to suspension. Other administration officials accompanied him, taking names and photographs.

The group remained in Wilson. No property damage was done, and order was maintained. Over time the size of the crowd approximately doubled; Sword said he later learned that many entered by windows. A crowd of at least fifty people assembled outside Wilson Hall, and at one point, for about ten seconds, some of those inside chanted "come on in."

Around midnight police arrived and arrested about thirty of those in Wilson Hall. The students made no resistance, and in fact swept the floor before leaving.

Disciplinary proceedings against several students for participation in one or both "unregistered demonstrations" and for refusing to leave on request were initiated by college authorities. The evidence does not fully show the outcome of these hearings, which were resumed by the college after the Court denied preliminary injunctive relief. In the record are minutes of a meeting of the Executive Committee of the Board of Visitors, which made it plain, however, that at least one student was suspended for his part in the two "vigils" and that some others, at least, were punished.

Wilson Hall had never before been locked; it was normally open day and night. It contains most of Madison's administrative offices, some classrooms, and an auditorium which holds at least 700 people. Gene S. Wagner, chief of the campus security force, testified that he had often seen students congregating and talking in Wilson Hall and never knew anyone to be excluded. After the arrests were made, late Sunday or early Monday, the chains were removed and the building was reopened.

Testimony at the hearing also covered the Madison College "common law" of student group functions, the principles which had developed in case-by-case applications.

Dean Fox stated that he regarded both the Thursday and Sunday sit-ins as "unregistered demonstrations," despite the fact that more than 48 hours' notice was given in the latter case. Rule 1 states that a demonstration is "to be registered." Under the administration's interpretation, however, as the account of events should have made clear, "registration" involves not just notice but administration approval as well.

The rules are not always invoked when demonstrations stray from approved areas. On at least one recent occasion, Dean Fox testified, a protest march by 1300 students, which also concerned faculty hiring policy, departed from its registered zone; nevertheless no sanctions were imposed on organizers or participants. Fox said punishment would have been "ludicrous" because the originally designated space was far too small.

Certain organized student group functions are not subject to the notice and location requirements of the handbook rules. Only "demonstrations" as defined therein are covered, Fox testified. Although the definition itself includes the term "meeting," in practice it is not forbidden to student groups to requisition and make use of indoor locations for meetings. A member of Dean Fox's

staff, the Director of Student Activities, generally settles the question of whether a given event is a "meeting" or a "demonstration," but if there is some question in her mind, Dean Fox resolves it. He stated that he had full discretion in the matter, within the guidelines of the regulations.

Under this practice prior consent must be secured for both "meetings," for which space is "requisitioned," and "demonstrations," which are "registered," but if it is the decision of the Director or Dean Fox that the proposal involves a "demonstration," Rule 4 establishes that it may not proceed indoors, and other restrictions of the rules apply.

President Miller testified that a "demonstration" is defined according to its purpose, as set out in the regulations: "welcome, approval, protest, or condemnation." He also said that the notice and location rules were intended to be enforced, and that in the earlier instance of the march that strayed out of bounds, no complaint had been brought to his attention.

■■■ Tinker v. Des Moines Independent School District Committee, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), establishes that the guaranties of the first amendment, "applied in the light of the special characteristics of the school environment," *id*, 506, 89 S.Ct. 736 extend to those attending public educational institutions. The Supreme Court overturned in that case the suspension of students who broke a rule forbidding the wearing of black armbands, symbols of protest, where the record showed no consequent disruption:

> The District Court concluded that the action of the school authorities was reasonable because it was based upon their fear of a disturbance from the wearing of the armbands. But, in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from

the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, Terminiello v. Chicago, 337 U.S. 1 [69 S. Ct. 894, 93 L.Ed. 1131] (1949); and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society. *Id.*, 508–509, 89 S.Ct. 737.

Apprehension alone will not justify repression. This is far from saying, of course, that reasonable regulation of expression is forbidden. The usual factors of time, place, and manner may be the subject of neutral rules, so long as expression is not thereby unduly hampered.

> [The student] may express his opinions, even on controversial subjects * * *, if he does so "without materially and substantially interfering with appropriate discipline in the operation of the school" and without colliding with the rights of others. Burnside v. Byars [, 363 F.2d 744, 749 (5th Cir. 1966)]. But conduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech. Cf. Blackwell v. Issaquena County Board of Education, 363 F.2d 749 (C. A. 5th Cir. 1966), *Id.*, 513 [89 S.Ct. 740]. See also, Saunders v. Virginia Polytechnic Institute, 417 F.2d 1127, (4th Cir. 1969); Barker v. Hardway, 399 F.2d 638 (4th Cir. 1968) cert. denied, 394 U.S. 905 [89 S.Ct. 1009, 22 L.Ed.2d 217] (1969).

The language of this leading case is broad, but it is sufficiently similar to

that employed in decisions concerning the off-campus regulation of expression to enable the Court to draw on the wealth of precedents in that area. This will not always be appropriate, but where major sanctions are in issue, the analogies may be close indeed.

The plaintiffs urge two grounds for declaratory relief. First, they assert that their actions in Wilson Hall constituted protected expression, for which sanctions are barred. Saunders v. Virginia Polytechnic Institute, *supra*. Second, they contend, under the special standing rules applicable, Dombrowski v. Pfister, 380 U.S. 479, 486, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), that whatever protection their acts might be due in the face of valid rules, the rules under which they stand charged are void and cannot thus be employed to punish their acts.

■ The defendants insist preliminarily that the plaintiffs ought to exhaust administrative remedies prior to seeking judicial relief. The claim has no merit. When a State college student seeks relief from administrative discipline, normally courts will not treat the issue until the punishment is final. Scoggin v. Lincoln University, 291 F. Supp. 161 (W.D.Mo.1968). The defendants contend that because all but two failed to appeal their cases to the Executive Committee of the Board of Visitors, the non-appealing students forfeited their right to judicial review.

■ It appears from the Executive Committee minutes that several students were punished by the Faculty Judiciary Committee and were notified that they might have their cases reviewed by the former body. The minutes indicate, however, that questions of punishment alone were considered. In any case the defendants do not assert that the penalties imposed on all are not now final. The regulations themselves give the Faculty Judiciary Committee appellate jurisdiction and do not mention further review.

The Court's power is not limited by the exhaustion doctrine. Damico v. Cal-

ifornia, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967). Absent the slightest evidence of intentional waiver or nonfinality, there is no reason to apply it in these circumstances. This is doubly so because the plaintiffs now seek declaratory relief concerning the application of the rules in future instances; for this they are not required to "await the outcome of protracted litigation," Dombrowski v. Pfister, *supra*, 380 U.S. 487, 85 S.Ct. 1121.

The Court will proceed to consider the students' attacks on the facial validity of the rules.

First, the plaintiffs contend that the 48 hour registration requirement unduly suppresses spontaneous expression.

They claim as well that Rule 4, a wholesale bar on demonstrations inside any building, is, under any reasonable definition of the term "demonstration," over-broad.

The plaintiffs also urge that the regulation which enables the administration to impose immediate suspension on participants in "unauthorized" demonstrations when they fail to disband on request is invalid as well for over-breadth. When applied in conjunction with Rules 1 and 4, also attacked, and the definition of "demonstrations" embodied in the rules, it is charged that this provision authorizes summary, nonreviewable termination of protected activities.

These contentions necessarily imply an attack on the definition of a "demonstration", which triggers the regulations. Vagueness in this standard may vest excessive discretion in administrators. Before the fact, the students contend, it would empower them to forbid indoor events, perhaps substantially impairing the exercise of protected freedoms, without having to justify their rulings according to specific standards. Cf. Shuttlesworth v. City of Birmingham, 394 U.S. 147, 153, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). After the fact, vagueness might lead to the abuse of labeling those functions which met disapproval as "demonstrations," and therefore "unauthorized." *Cf.* Cox v. Louis-

iana, 379 U.S. 536, 85 S.Ct. 453, 13 L. Ed.2d 471 (1965).

■ Matter for threshold inquiry is whether regulations imposed by State college administrators are subject to the requirements of specificity and narrowness applied to criminal statutes of more general application. Divergent rulings are outstanding. Compare Soglin v. Kauffman, 295 F.Supp. 978 (W.D.Wis. 1968), aff'd, 418 F.2d 163 (7th Cir. 1969), with Esteban v. Central Missouri State College, 290 F.Supp. 622 (W.D. Mo.1968), aff'd, 415 F.2d 1077 (8th Cir. 1969). Even the *Esteban* decision expresses agreement, however, with Hammond v. South Carolina State College, 272 F.Supp. 947 (D.S.C.1967), wherein a prior restraint rule was held unenforceable on its face, without investigation into the character of the conduct sought to be punished. In this case plaintiffs seek a declaration that the rules in force are void in addition to a ruling that their conduct may not be punished. Consistent with either *Esteban* or *Soglin*, the Court should entertain their vagueness and over-breadth challenges. Whether over-breadth, if established, is an effective defense against punishment for unprotected conduct is a separate issue.

On the first issue, the Court finds itself in agreement with Professor Wright, who views conventional vagueness standards as quite as worthwhile and not unjustifiably difficult to maintain on campus as well as off. Wright, The Constitution on Campus, 22 Vanderbilt L.Rev. 1027, 1060–1067 (1969). Indefinite rules always leave room for arbitrariness or favoritism in decision-making, whether the question be that of granting a permit or adjudicating the question of an infraction. Nor can the most exacting procedures be fully fair if the crime itself is insufficiently defined. Moreover, rules which are over-broad, whether for vagueness or other reasons, have an *in terrorem* effect which by definition chills constitutional expression.

■■ The faults of the Madison College rules are manifold. Demonstrations by means of mass gatherings, marches, and rallies are entitled to the protection of the first amendment. Shuttlesworth v. City of Birmingham, *supra*; Cox v. Louisiana, *supra*; Abernathy v. Conroy, 429 F.2d 1170 (4th Cir. 1970). To be sure, they are subject to more extensive regulation than those forms of expression which come less into conflict with others' legitimate interests. Cox v. Louisiana, *supra*, 379 U.S. 554–555, 85 S.Ct. 453. But insofar as the State seeks to regulate such activities it must not act in such a sweeping manner as needlessly stifles expression, nor vest the power to censor in its officials, Cox v. Louisiana, *supra*, 574, 85 S.Ct. 453. The Madison rules fall afoul of both these constitutional requirements.

■ Rules subjecting the exercise of first amendment activities to prior approval are inherently suspect. They are invalid if they permit those empowered to enforce them to deny permission upon criteria unrelated to proper regulation of the use of public places. However reasonable and equally enforced regulation of the time, place, manner and duration of forms of expression less pure than speech alone is permissible. Shuttlesworth v. City of Birmingham, *supra*; Kunz v. New York, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951); Niemotko v. Maryland, 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951); Cox v. New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941).

Likewise, criminal statutes not including the licensing feature are invalid for over-breadth if cast in vague terms so that they may be employed, in the enforcer's discretion, against protected activities. Brown v. Louisiana, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) (Opinion of Fortas, J.); Cox v. Louisiana, *supra*, 379 U.S. 551, 85 S.Ct. 453; Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963).

■ Here the vagueness of the definition of "demonstration" raises both of these problems. It calls into play the prior approval rule, to begin with. If the administrator, to whom ap-

plication for registration is made, views the projected activity as a demonstration, he may ban its conduct indoors and determine the "appropriate areas" to be used outdoors—substantial restrictive powers flow from such a conclusion. Yet the prefatory definition of that which is subject to such limitation does not incorporate objective criteria such as number of participants, presence of sound amplifiers or musical instruments, or other factors which might, in various degrees, present a menace to others' property or tranquility. The phrase "a mass meeting, procession, picketing, or occupation of premises" embraces all group activities—what group does not occupy premises?—and more—one can picket alone and be a "demonstration" unless the adjective "mass" applies to all the nouns that follow. Yet the Court knows from the uncontradicted testimony that rooms may be requisitioned for some "meetings." Moreover, the regulations expressly exempt "exhibitions commonly associated with social or athletic activities." As the testimony revealed, what constitutes a regulated demonstration is determined by what the administrator construes to be its purpose.

A first objection to such a criterion of regulability is that it bears no relation to the "traffic control" standards which the State may impose on the right to assemble and express views. If it means anything at all, it is a flat regulation of content and therefore bad. Thomas v. Collins, 323 U.S. 516, 536, 65 S.Ct. 315, 89 L.Ed. 430 (1945). The factors which indicate purpose are, however, so elusive that in practical effect the administrators may "roam essentially at will, dispensing or withholding permission to speak, assemble, picket, or parade, according to their own opinions regarding the potential effect of the activity in question on the "welfare," "decency," or "morals" of the community." Shuttlesworth v. City of Birmingham, *supra*, 394 U.S. 153, 89 S.Ct. 935.

A further defect is the exemption granted to "athletic" or "social" functions. The latter, in particular, adds an additional element of vagueness to the description itself. More important, however, is that it reinforces the institution's position of non-neutrality as between opinions expressed. "[I]f a particular area is off-limits for a political demonstration it must be off-limits also for football pep rallies, art auctions, and other equally noisy or congested activities." Wright, *supra*, 1046.

The definition would render the regulations invalid even absent the licensing aspect. By rule, notice of a "demonstration" at least must be given and indoor activities are banned; noncompliance with Rules 1 and 4 brings on punishment. However, by reason of the ambiguous purpose-oriented definition referring in terms to any campus gathering, the regulations cast a pall of uncertainty even over meetings to which, on an authoritative construction, they might be inapplicable. It may be the intention of college authorities to enforce the regulations only when a gathering actually or foreseeably conflicts with the interests of others to carry on personal or educational pursuits, but their terms permit them to be invoked on a much lesser showing. Even if an indoor function has been authorized, in effect, by requisitioning a room, those who attend must behave with circumspection, lest their conduct be regarded "approval" or "protest." Outdoor functions, for which no notice has been given, will be similarly constrained. "There is an equally plain requirement for laws and regulations to be drawn so as to give citizens fair warning as to what is illegal * * *," Cox v. Louisiana, *supra*, 379 U.S. 574, 85 S.Ct. 486. Because the definition is so ambiguous, it necessarily deters the exercise of first amendment freedoms. Baggett v. Bullitt, 377 U.S. 360, 371–374, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964); N.A.A.C.P. v. Button, 371 U.S. 415, 432–433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). As such it must be found invalid.

This is not to say that indoor or outdoor activities are not regulable by narrow rules which address themselves to factors unrelated to the content of the views expressed, and protect the

legitimate interests of members of the college community in operating and making use of the educational facilities that the citizens of Virginia have furnished. Edwards v. South Carolina, *supra*, 372 U.S. 236, 83 S.Ct. 680; Abernathy v. Conroy, *supra*. These are substantial, valid interests which defendants have the unquestioned right and the duty to defend. However, the protective framework they erect must be one which does not by its very existence infringe upon students' right to engage in first amendment activities unhampered by fears of penalty under outstanding regulations.

■ The plaintiffs' complaint over the 48 hour notice regulation, Rule 1, has merit even when the rule is considered separately from the vague "demonstration" definition which triggers it, and apart also from the place limitations later discussed. The first amendment protects spontaneous as well as planned activities. No showing has been made that safety and police precautions can only be prepared on two days' notice. Even assuming that the provisions of Rule 2 regarding "reasonable demonstration activities" and Rule 4 relating to determinations of "appropriate areas" for demonstrations do not empower administrators to reject an application or curtail activities with uncontrolled discretion, as *Shuttlesworth, supra*, forbids, there seems no reason why narrower rules prohibiting particular unprotected acts would not adequately forestall the untoward consequences of spontaneous gatherings. On its face the rule outlaws them entirely, and it is far from plain that it would be waived when advance planning is impossible. Compare Powe v. Miles, 407 F.2d 73, 84 (2d Cir.1968).

Rule 1 needlessly prohibits this category of protected activity. Wright, *supra*, 1044.

■ Likewise, the rule against indoor demonstrations of any kind is over-broad. No showing has been made that every building on campus houses such activities or facilities that the presence of even a limited number of persons whose presence is not otherwise required would tangibly disrupt legitimate functions.[1]

Cases outside the campus context have recognized that the exercise of first amendment rights on public premises may not be barred simply because individuals wish to use an indoor forum. Brown v. Louisiana, *supra*; Edwards v. South Carolina, *supra*; Davis v. Francois, 395 F.2d 730, 733 n. 4 (5th Cir. 1968); Wolin v. Port of New York Authority, 392 F.2d 83, 89 (2d Cir.1968).

When such a blanket prohibition is imposed on demonstrations in the interior of any building, the duty falls upon the regulatory authority to show that a considered judgment has been made between the values of competing interests and uses, and that, due consideration having been given to lesser limitations, the State officials have been led to a belief, based on fact, that only a total ban can prevent disruptions of the institution's function. Cf. Scoville v. Board of Education of Joliet Township, 425 F.2d 10 (7th Cir.1970); Wright, *supra*, 1045. No such showing has been made here. President Miller merely remarked that Rule 4 was intended to prevent "hysteria." It is a drastic cure indeed, especially in view of the fact that provocative discussion has long been shielded from punishment. Bachellar v. Mary-

[1] The defendants' memorandum suggests that if the Court does not conclude that the rule is reasonable and constitutional on any state of the facts, an opportunity should be granted the defendants to present evidence as to the reasonableness of the rules. The Court will not do so, for the time for presenting materials in opposition to the plaintiffs' motion has passed. The motion has been submitted for the Court's ruling, and the defendants have not shown by affidavit or otherwise reasons for which they cannot "present by affidavits facts sufficient to justify [their] opposition," Fed.Rules Civ. Proc., Rule 56(f), 28 U.S.C. No request for a continuance has been made. The Court shall rule on the motion on the uncontradicted facts before it.

**1066**

land, 397 U.S. 564, 567, 90 S.Ct. 1312, 25 L.Ed.2d 570 (1970); Terminiello v. City of Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949). The asserted justification loses force, too, in the face of the exceptions Madison has carved out; athletic rallies and teach-ins are evidently considered not likely to lead to uncontrollable conduct.

The site of the protest here in issue, Wilson Hall, contains offices and a sizeable auditorium. While less busy than the facility involved in *Wolin, supra,* the Wilson lobby at times must sustain substantial traffic. As such, and as the administrative center of the college, the location both affords an audience to persuade and constitutes the usual locus of those in power to whom grievances are addressed. The punishment of silent protest in a library facility has been struck down by the Supreme Court, Brown v. Louisiana, *supra.* No showing has been made in this case that a rule which bans even such conduct is compelled by the nature of each facility on the Madison campus. Perhaps certain locations might be the subject of specific regulation, as the health center already is. Cf. Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966). However, a rule covering every building within the promulgating authority's jurisdiction appears not to be the product of a considered balancing between competing interests of expression and of office pursuits, study, and repose. Cf. Davis v. Francois, 395 F.2d 730 (5th Cir.1968). The end is lawful, but the need for such sweeping means is not shown.

▮▮▮ Fourth, the students contend that the disbanding order rule included in the penalty section of the regulations is unconstitutional in that it empowers a college official to impose sanctions based upon his sole judgment that a failure to register what he considers to be a "demonstration," apparent departure from the terms of authorization, or another official's refusal to authorize a function under existing rules, renders a given activity illegal.

The legitimacy of such a rule turns largely on the question of what issues will be considered open in subsequent judicial or quasi-judicial hearings. If the only matter to be decided (assuming there is a hearing at all) is compliance *vel non* with the order to disband, the regulation acts as an unconstitutional prior restraint, for the administrator's determination that conduct had wandered into unprotected areas is insulated from review. Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). However, if the question whether in fact grounds for a disbanding order, consistent with valid rules, existed may be contested at some time before the penalty is made final, the disbanding rule is a valid and probably beneficial warning device. Powe v. Miles, *supra,* 407 F.2d 84–85; Cf. Kingsley Books, Inc. v. Brown, 354 U.S. 436, 439, 77 S.Ct. 1325, 1 L.Ed.2d 1469 (1957).

According to the only evidence before the Court as to the manner in which disciplinary hearings are conducted, the sole issue in dispute is compliance *vel non* with the order to disband. So enforced, the rule enables any named official to impose an instant cutoff on protected activities; it is consequently invalid. Hammond. v. South Carolina State College, *supra.*

▮▮▮ Having decided that the only regulations which the college apparently seeks to enforce against these plaintiffs are not consistent with the Constitution, the Court might well conclude that the nature of the plaintiffs' activities is therefore irrelevant to the question whether they may be punished. Some courts have so held. Soglin v. Kauffman, *supra,* 418 F.2d at 168; Hammond v. South Carolina State College, *supra,* 272 F.Supp. 950.

Whether the first amendment standing requirements are applicable on campus is an open question. One commentator has said that the doctrine exacts at times a high price for the protection of freedom of expression. Wright, *supra,* 1066–1067. It would seem, however, that the more serious cases of violent

misconduct could at least be punished under conventional criminal statutes if college disciplinary rules fail.

The issue need not be decided now, however, for the uncontradicted facts show that the conduct of the students sought to be punished amounted only to protected expression. A peaceful manifestation of dissent or concern cannot be punished, under *Tinker, supra,* so long as it does not interrupt the educational process or conflict with the rights of others. Here on both occasions the students in Wilson Hall displayed exemplary orderliness. They were courteous toward administration representatives and toward the police who appeared on Sunday night. They did not break into the premises; indeed the evidence is that they went to Wilson on Thursday partly because they knew it was left open night and day. Their principal purpose was to meet with President Miller in the morning, having waited overnight to dramatize their concern. Nothing in the file indicates that the students intended anything but a calm discussion with the president. No property damage occurred, and there is positive evidence to the effect that the occupants took pains to be neat. No one was excluded from entering the lobby or using it for access to other rooms.

In the absence of the slightest showing of inconvenience or reasonable expectation thereof to those with competing rights to use of the area, the plaintiffs' conduct cannot but be protected by the first amendment. Scoville v. Board of Education, *supra*; Saunders v. Virginia Polytechnic Institute, *supra*; Zanders v. Louisiana State Board of Education, 281 F.Supp. 747 (W.D.La.1968). The record in this case is a far cry from the sort of conduct which courts have found to be good grounds for disciplinary action. Powe v. Miles, *supra*; Barker v. Hardway, *supra*; Marzette v. McPhee, 294 F.Supp. 562 (W.D.Wis. 1968); Cf. Scoggin v. Lincoln University, *supra*.

That the participants engaged in singing and, very briefly, chanting does not render their activity unprotected. No evidence indicates that the noise disturbed anyone, caused the crowd to become less controllable, or was in any respect incompatible with the time and place; as such it cannot be cause for punishment. Cox v. Louisiana, *supra*, 548; Edwards v. South Carolina, *supra*, 233. A different case might be presented if the crowd had made noise during working hours, when lectures and office work go on. See Wolin v. Port of New York Authority, *supra*, 392 F.2d 83, 90 n. 8. Nor may the slight unrest among onlookers occasioned by the plaintiffs' acts serve as cause for discipline. Cox v. Louisiana, *supra*, 379 U.S. 551–552, 85 S.Ct. 453; Edwards v. South Carolina, *supra*, 372 U.S. 238, 83 S.Ct. 680; Terminiello v. City of Chicago, *supra*. Nor, further, did the plaintiffs subject themselves to sanctions when they calmly refused to comply with Dean Fox's orders to discontinue their protected activities. "[O]ne cannot be punished for failing to obey the command of an officer if that command is itself violative of the Constitution." Wright v. Georgia, 373 U.S. 284, 291–292, 83 S.Ct. 1240, 1245, 10 L.Ed.2d 349 (1963).

On the record as a whole there is no showing that the demonstration involved elements of conduct that the State might make criminal. Brown v. Louisiana, *supra* (opinion of Fortas, J.); Garner v. Louisiana, 368 U.S. 157, 82 S.Ct. 248, 7 L.Ed.2d 207 (1961). The plaintiffs are entitled to a declaration that they may not be punished for the demonstrations in Wilson Hall.

The defendants' motion to dismiss shall be denied. An order granting summary judgment shall enter.

## APPENDIX

### REGULATIONS ON DEMONSTRATIONS AND PEACEFUL ASSEMBLY

Madison College seeks to preserve and to encourage the exercise of the rights of expression, conscience, affiliation, and peaceful assemblage. The College is

equally mindful that a reasonable and lawful scheduling and assignment of College facilities, resources, and personnel consistent with the civil liberties expressed in the first amendment of the United States Constitution, are necessary in order to assure the pursuit of educational programs, to accommodate the needs of all persons, and to respect the rights of all members of the College Community.

The orderly conduct of classes is basic to the primary purpose of the College. Demonstration procedures are established to guarantee the continuation of this function and the continued health and safety of the members of the campus community. The College neither permits nor forbids demonstrations off campus by students or student organizations. The students or student organizations demonstrating off campus are reminded that they are expected to act in a manner that will conform to all national, state, and municipal laws and ordinances. The College is particularly concerned that this responsibility be fulfilled when students or student organizations demonstrating off campus identify themselves as students of Madison College.

A demonstration is considered to be a public manifestation of welcome, approval, protest, or condemnation as by a mass meeting, procession, picketing, or occupation of premises. (Exhibitions commonly associated with social or athletic activities are not within the purview of this policy and its supporting regulations.)

In order to achieve all purposes above, to provide regulations in the event of demonstrations on campus by students or student organizations, and to assure the administration of this policy consistent with all the purposes expressed above, the following procedures are established:

1. The demonstration is to be registered with the Office of Student Activities 48 hours in advance.

2. At the time of registration, the student is advised regarding reasonable demonstration activities.

3. Demonstrations are not to block traffic.

4. Demonstrations are forbidden in the areas of the Health Center, inside any buildings and congregating in the locations of fire hydrants. The appropriate areas for demonstrations will be determined at the time of the request.

5. The number of pickets may be limited by reasonable consideration of space in the proposed demonstration areas. Students are to be informed of this at the time of registration.

6. The right of expression is not to be confused with license to incite violence or to use indecent language, because these are beyond legal and reasonable espousal of any cause for which demonstrations are conducted.

7. If disturbance from observers begins to develop, the demonstrators are expected to refrain from altercations with observers.

8. Observers are expected to maintain a reasonable distance between themselves and the demonstrators at all times.

9. Observers may not obstruct legitimate demonstrations by physically blocking the path, by blocking other observers, throwing objects, or in any way acting to limit the right of free expression.

10. Both demonstrators and observers are expected to follow the directions of the Campus Police.

The Director of Student Activities shall submit to the Dean of Student Services a summary of the advice given the applicants for demonstrators, and inform the Chief of the Campus Security Force of the proposed demonstration.

The Dean of Student Services assigns one or more of the members of his staff to observe the demonstration. A complete report is made by the observing

representative on the following day. This is kept on file.

In the event that an assembly appears to be a demonstration related to grievances, those present should be advised that orderly procedures for the hearing of grievances are available and must be adhered to. Such procedures include: the "open door" policy of the President of the College, the Provost and Assistant Provost of the College, the Business Manager, the Dean of Student Services, and his administrative staff, as well as the open meetings with students held monthly by the President and Administrative Council of the College. College officials will not negotiate with groups under conditions of duress, such as unauthorized occupation of College property.

## PENALTIES

Students of the College are expected to conduct themselves as ladies and gentlemen both within the College and elsewhere. For student conduct which is outside the jurisdiction of the College but which tends to discredit or injure the College, the President is authorized by the Board of Visitors to impose such penalty as he may deem appropriate, including expulsion from the College. This responsibility is implemented by the Faculty Judiciary Committee, subject to review by the President.

Any student found guilty of participating in or inciting a riot or an unauthorized or disorderly assembly is subject to suspension.

When an assembly of students not authorized by the Dean of Student Services, the Dean of Men, or the Deans of Women has been requested to disband by the President or by an officer of the Student Government Organization or Student Government Association, or by a dean or other administrative officer, those students refusing to comply will be subject to immediate suspension.

## APPEALS

Any student or student organization convinced in good faith that arbitrary, unlawful, or unreasonable limitations have been imposed upon any demonstration or proposed demonstration, or any student or student organization subjected to disciplinary action under the provisions of this policy may appeal to the Faculty Judiciary Committee.

## ORDER

## DENYING MOTION TO DISMISS AND GRANTING MOTION FOR SUMMARY JUDGMENT

In accordance with the memorandum of the Court this day filed, it is adjudged and ordered that:

1. The motion of the defendants to dismiss the complaint be, and the same is hereby, denied.

2. The case may proceed as a class action under Fed.Rules Civ.Proc., Rule 23(a) and 23(b) (2), 28 U.S.C.

3. The plaintiffs' motion for summary judgment be, and the same is hereby, granted to the following effect:

a. The Court declares that the plaintiffs may not be subjected to discipline by the defendants for their participation in unregistered demonstrations in Wilson Hall at Madison College on the nights of April 23 or 26, nor for their failure to disband such activities when directed to do so by a college official.

b. The Court declares that, of the Madison College "Regulations on Demonstrations and Peaceful Assembly," the operative definition of a "demonstration;" Rule 1; and Rule 4, to the extent that it forbids demonstrations inside any building, are facially unconstitutional, and that the penalty provision allowing the suspension of students who refuse to comply with an order to disband an unauthorized demonstration is invalid as applied.

4. This case be retained on the docket for consideration of such further requests for relief as may be made.

Let the Clerk send a copy of the memorandum and this order to all counsel of record.