**Joan BECKERMAN, et al.,
Plaintiffs-Appellants,**

v.

**CITY OF TUPELO, MISSISSIPPI, A
Municipal Corporation, et al.,
Defendants-Appellees.**

No. 79–3666.

United States Court of Appeals,
Fifth Circuit.*
Unit A

Dec. 23, 1981.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

504

Ronald W. Lewis, David G. Hill, Oxford, Miss., Robert Rubin, American Civil Liberties Union, Jackson, Miss., for plaintiffs-appellants. .

Guy Mitchell, Jr., Thomas D. Murry, Tupelo, Miss., for defendants-appellees.

Before GEE, TATE and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Appellants, members of the International Committee Against Racism (InCAR), filed suit in district court seeking injunctive relief against the enforcement of parade and sound equipment ordinances enacted by the City of Tupelo, Mississippi.[1] The parade ordinance contains a permit application system, regulations regarding the conduct of paraders, and exceptions to the ordinance. The sound equipment ordinance also pre-

scribes a permit system and conduct regulations but provides no exceptions. Appellants allege that the ordinances are unconstitutional because they are vague and overbroad and constitute impermissible prior restraints upon freedom of speech. The district court upheld both ordinances in full with the exception of one provision, which was subsequently amended by Tupelo. Appellants appealed the judgment to this court. We reverse the judgment of the district court with respect to all but one of the challenged provisions.

## I. STANDING AND JUSTICIABILITY

■ Appellants challenge the facial validity of various provisions of both the parade and sound equipment ordinances as being vague, overbroad, and prior restraints upon freedom of speech. Although neither the district court nor the appellee has questioned appellants' standing to make these challenges, we find it necessary to address the issue briefly. When a statute is challenged on its face, the facts of the challenging party's case are irrelevant; the court is asked to determine the constitutionality of the statute as written. Nevertheless, the party's claim must meet the constitutional requirements of a "case or controversy" in order to be justiciable.

■ Because appellants have not been refused a parade permit under the ordinance, their challenges to its constitutionality are somewhat anticipatory. In the First Amendment area, however, courts permit facial challenges to state regulations. *See, e. g., Hynes v. Mayor of Oradell*, 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976); *International Society for Krishna Consciousness v. Eaves*, 601 F.2d 809, 819 (5th Cir. 1979). In the case of a licensing statute containing allegedly excessive discretion, facial challenges are permitted because the mere existence of such discretion is unconstitutional. *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *ISKCON v. Eaves*, 601 F.2d at 823. Appellants need not allege that there has been an abuse of discretion

1. The relevant sections of the ordinances are contained in the Appendix.

as a prerequisite to a facial attack. *Thornhill v. Alabama*, 310 U.S. 88, 97, 60 S.Ct. 736, 741, 84 L.Ed. 1093 (1940); *Schneider v. State*, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939). Thus, appellants may challenge the parade licensing statute. Because appellants have been refused a permit under the sound equipment ordinance, they have unquestioned standing to challenge that ordinance.

■ Appellants have standing to challenge those provisions of both the parade and sound equipment ordinances which regulate the conduct of permittees because they are entitled to fair notice of the conduct the ordinances attempt to prohibit. The fear of punishment for violations of the ordinances may inhibit appellants as well as others who may contemplate holding a parade or using a sound truck in the exercise of their First Amendment rights. This is a sufficient injury to confer standing upon appellants. *Reeves v. McConn*, 631 F.2d 377, 381 (5th Cir. 1980); *ISKCON v. Eaves*, 601 F.2d at 822–24.

## II. THE PARADE ORDINANCE

### A. Section 1(c)(1); Arbitrary discretion?[2]

This section of the ordinance authorizes the Chief of Police to deny a permit if he finds that "the conduct of the parade will probably cause injury to persons or property or provoke disorderly conduct or create a disturbance." We discuss the constitutionality of each clause of this section individually.

#### 1. "provoke disorderly conduct"

This clause of § 1(c)(1) authorizes the Chief of Police to deny a parade permit if he determines that the issuance will "provoke disorderly conduct." There are three issues regarding this provision: first, whether it is overbroad because it fails to describe with sufficient specificity and limitation the situations in which a permit may be denied; second, whether it constitutes an impermissible prior restraint upon the exercise of free speech; and third, whether it is void for vagueness.

### (a) Overbreadth

■ Appellants argue that the provision allowing the licensor to deny a permit if he finds that the parade will "provoke disorderly conduct" is overbroad because the term "disorderly conduct" may include activity protected by the First Amendment. A law is overbroad if it "does not aim specifically at evils within the allowable area of control . . . but sweeps within its ambit other activities that constitute an exercise" of First Amendment rights. *Thornhill v. Alabama*, 310 U.S. at 97, 60 S.Ct. at 741. A law will not be voided for overbreadth, however, unless its deterrent effect on protected activity is substantial. *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 2917, 37 L.Ed.2d 830 (1973). When a licensing statute is challenged as being overbroad, the claim is that the circumstances under which a license may be denied include activity which is protected. The result is that the state achieves indirectly through the denial of a permit what it could not achieve directly through a blanket prohibition of the activity. *See generally* L. Tribe, *American Constitutional Law*, § 12–35 (1978). Thus, the purpose of our review will be to determine whether this provision may be applied so as to prohibit protected activity to a substantial degree.

■ Tupelo's ordinance does not include a definition of disorderly conduct, and because the ordinance was enacted so recently, Mississippi courts have not had an opportunity to supply one. We assume that the meaning of "disorderly conduct" in the ordi-

---

**2.** A licensing statute containing provisions virtually identical to those of § 1(c)(1) came before the Fifth Circuit in *LeFlore v. Robinson*, 434 F.2d 933 (5th Cir. 1970), *vacated* on the grounds of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), 446 F.2d 715 (5th Cir. 1971). In that case, the court found the statute to be unconstitutional because it lacked the procedural safeguards required by *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). The court did not reach the issues of vagueness and overbreadth but noted the possibility of such defects. 434 F.2d at 945 n.13.

nance is the same as in Mississippi's criminal statute prohibiting disorderly conduct.[3]

█ This definition, however, has been declared overbroad as applied to certain situations. In *Thomas v. Mississippi*, 380 U.S. 524, 85 S.Ct. 1327, 14 L.Ed.2d 265 (1965), the Supreme Court reversed a conviction under § 2087.5 of the Mississippi Code (the predecessor to § 97–35–3) for disorderly conduct because the statute had been applied so as to criminalize the refusal of a black person to leave a bus station when so requested by a policeman because of the hostility of white people in the terminal. *See also Boynton v. Virginia*, 364 U.S. 454, 81 S.Ct. 182, 5 L.Ed.2d 206 (1960) (finding a similar Virginia statute unconstitutional). We make no judgment as to the constitutionality of that statute since it is not before us, but we do find that the term "disorderly conduct" as employed in the parade licensing statute is overbroad because it could be applied to deny permits to those seeking to engage in protected activity. The conviction in *Thomas v. Mississippi, supra*, is just such an example. The disorderly conduct statute has also been used without out constitutional justification to convict persons for walking in tandem in an orderly fashion displaying a flag and signs protesting racial discrimination. *Brown v. Rayfield*, 320 F.2d 96 (5th Cir. 1963), *cert. denied*, 375 U.S. 902, 84 S.Ct. 191, 11 L.Ed.2d 143 (1963). Decisions also cast doubt upon the validity of several provisions of the disorderly conduct statute without regard to racial situations. *See, e. g., Rosenfeld v. New Jersey*, 408 U.S. 901, 92 S.Ct. 2479, 33 L.Ed.2d 331 (1972) (use of vulgar profanity as speaker at a school board meeting as being "a disorderly person"); *Gooding v. Wilson*, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972) (overturning conviction under statute prohibiting use of "opprobrious words or abusive language,"); *Bachellar v. Maryland*, 397 U.S. 564, 90 S.Ct. 1312,

---

3. In determining the meaning of statutory language in the absence of interpretation by the state, the Supreme Court has looked to dictionary definitions. *See, e. g., Gooding v. Wilson*, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972). In this instance, however, the phrase in question, having a developed meaning in state law, is properly here assumed to have that meaning. The Chief of Police testified at trial that he would supply the Mississippi Code's definition of "unarmed" to the use of that term in another section of the parade ordinance, and, because we assume he intends to interpret the licensing provision in the same manner, we construe the ordinance as if the Mississippi statutory definition of disorderly conduct were incorporated.

Mississippi Code Annotated § 97–35–3 reads as follows:

Disorderly conduct—certain acts performed with intent to provoke breach of peace—penalties.

(1) Whoever with intent to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned thereby:

(a) crowds or congregates with others in or upon shore protecting structure or structures, or a public street or public highway, or upon a public sidewalk, or any other public place, or in any hotel, motel, store, restaurant, lunch counter, cafeteria, sandwich shop, motion picture theatre, drive-in, beauty parlor, swimming pool area, or any sports or recreational area or place, or any other place of business engaged in selling or serving members of the public, or in or around any free entrance to any such place of business or public building, or to any building owned by another individual, or a corporation, or a partnership or an association, and who fails or refuses to disperse or move on, when ordered so to do by any law enforcement officer of any municipality, or county, in which such act or acts are committed, or by any law enforcement officer of the State of Mississippi, or any other authorized person, or

(b) insults or makes rude or obscene remarks or gestures, or uses profane language, or physical acts, or indecent proposals to or toward another or others, or disturbs or obstructs or interferes with another or others, or

(c) while in or on any public bus, taxicab, or other vehicle engaged in transporting members of the public for a fare or charge, causes a disturbance or does or says, respectively, any of the matters or things mentioned in paragraph (b) *supra*, to, toward, or in the presence of any other passenger on said vehicle or in the process of boarding or departing from said vehicle, or any employee engaged in and about the operation of such vehicle, or

(d) refuses to leave the premises of another when requested so to do by any owner, lessee, or any employee thereof, shall be guilty of disorderly conduct. . . .

25 L.Ed.2d 570 (1970) (overturning conviction under statute that prohibited "acting in a disorderly manner to the disturbance of the public peace").

No narrowing construction has been offered by the Tupelo city council or the Mississippi courts. Because we do not sit as a "super" state legislature, we may not impose our own narrowing construction onto the ordinance. *Brown v. Oklahoma*, 408 U.S. 914, 92 S.Ct. 2507, 33 L.Ed.2d 326 (1972); *Gooding v. Wilson*, 405 U.S. at 520, 92 S.Ct. at 1105. We fully recognize the fact that Tupelo enacted the ordinance in good faith and intends to apply it in a fair manner. We cannot, however, overlook the substantial potential for overbroad application of the ordinance. Therefore, this part of the ordinance is unconstitutional.

*(b) Prior Restraint*

Appellants also allege that this provision constitutes an impermissible prior restraint on First Amendment freedoms. It has been firmly established as a matter of law that a state may regulate the use of its parks and streets for the protection of the public health, safety, and welfare. *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980) (municipality may require permit for solicitations by charitable organizations); *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (permit may be required to parade on city streets); *Kunz v. New York*, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951) (city may require permit for solicitation by religious groups); *Hague v. C.I.O.*, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) (city may impose reasonable regulations on use of public parks and streets) *ISKCON v. Eaves, supra* (municipal airports may impose reasonable regulations on solicitation within terminals).

The guidelines used by a licensor in granting or refusing a permit, however, must be related to the legitimate government interest in protecting health, safety, and welfare, and must be precisely and narrowly drawn to prevent discretionary decision-making. *Shuttlesworth*, 394 U.S. at 153, 89 S.Ct. at 940 (permit may not be conditioned on licensor's opinion regarding effects on welfare, decency, and morals of community); *Niemotko v. Maryland*, 340 U.S. 268, 271–72, 71 S.Ct. 325, 327, 95 L.Ed. 267 (1951) (nonstatutory licensing "practice" totally devoid of standards is unconstitutional); *Cantwell v. Connecticut*, 310 U.S. 296, 306, 60 S.Ct. 900, 904, 84 L.Ed. 1213 (1940) (permit may not be conditioned on licensor's determination of what is a religious cause). *But see Cox v. New Hampshire*, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941) (upholding licensing scheme after state court narrowed statute so that permits could be denied only if the proposed parade would interfere with public convenience on city streets). A licensing statute lacking such controls constitutes an impermissible prior restraint because of its potential to sanction the refusal of a permit to those seeking to engage in constitutionally protected activity.

This provision falls as an impermissible prior restraint upon free speech because it is not narrowly drawn to relate to health, safety, and welfare interests, but instead it sanctions the denial of a permit on the basis of the so-called "hecklers' veto." In authorizing the denial of a permit because the licensor has determined the activity will provoke disorderly conduct in others, the state treads on thin ice. There is a host of Supreme Court cases dealing with the issue of the "hecklers' veto." In almost every instance it is not acceptable for the state to prevent a speaker from exercising his constitutional rights because of the reaction to him by others. *See Coates v. City of Cincinnati*, 402 U.S. 611, 615–16, 91 S.Ct. 1686, 1689, 29 L.Ed.2d 214 (1971) (state may not punish citizens for engaging in conduct "annoying" to others); *Bachellar v. Maryland*, 397 U.S. at 567, 90 S.Ct. at 1314 (state cannot punish Viet Nam protestors because of the "resentment" of onlookers); *Gregory v. Chicago*, 394 U.S. 111, 117, 89 S.Ct. 946, 949, 22 L.Ed.2d 134 (1969) (disorderly conduct conviction cannot stand when defendant acted in an orderly

manner but surrounding crowd became hostile). *See also Street v. New York*, 394 U.S. 576, 592, 89 S.Ct. 1354, 1365, 22 L.Ed.2d 572 (1969); *Edwards v. South Carolina*, 372 U.S. 229, 237–38, 83 S.Ct. 680, 684, 9 L.Ed.2d 697 (1963); *Terminiello v. Chicago*, 337 U.S. 1, 4, 69 S.Ct. 894, 895, 93 L.Ed. 1131 (1949); *Stromberg v. California*, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931). *Compare Feiner v. New York*, 340 U.S. 315, 321, 71 S.Ct. 303, 306, 95 L.Ed. 295 (1951) in which the court said that when a speaker "passes the bounds of argument or persuasion and undertakes incitement to riot" he can be convicted for disorderly conduct. Yet the Court also stressed: "A state may not unduly suppress free communication of views . . . under the guise of conserving desirable conditions." *Id.* at 320, 71 S.Ct. at 306. "It is firmly established that under our Constitution the public expression of ideas may not be prohibited merely because the ideas themselves are offensive to some of their hearers." *Street v. New York*, 349 U.S. at 592, 89 S.Ct. at 1365.

■■■■ The existence of a hostile audience, standing alone, has never been sufficient to sustain a denial of or punishment for the exercise of First Amendment rights. This Court has said: "[t]he fact that some speech may stir listeners to disagree—perhaps even to disagree violently—does not by that fact alone permit regulation." *Wiegand v. Seaver*, 504 F.2d 303, 306 (5th Cir. 1974), *cert. denied*, 421 U.S. 924, 95 S.Ct. 1650, 44 L.Ed.2d 83 (1975). A state may not keep law and order by depriving citizens of their rights. *Cooper v. Aaron*, 358 U.S. 1, 16, 78 S.Ct. 1401, 1408, 3 L.Ed.2d 5 (1958). The City of Tupelo may not deny a parade permit simply because of the fear of adverse reaction to the marchers by others.

■■■■ The state is not powerless to prevent imminent violence or lawlessness resulting from a clash between the marchers and onlookers. If this situation arises, the police must try first to disperse and control the crowd, and if that becomes impossible, the marchers may be arrested. *Feiner*, 340 U.S. at 326–7, 71 S.Ct. at 309–310 (Black, J., dissenting). Likewise, if the

marchers exceed the bounds of persuasion and argument and enter the realm of incitement to imminent lawless action, they can be punished. *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969); *Feiner*, 340 U.S. at 321, 71 S.Ct. at 306. Such punishment or curtailment of First Amendment rights must be based on a present abuse of rights, not a pre-nascent fear of future misconduct.

■■■■ Disorderly conduct and incitement statutes are properly intended to prohibit and punish the abuse of First Amendment rights. A narrowly tailored statute to accomplish this goal is constitutionally acceptable. This ordinance is not so designed, however. It permits the Chief to deny a permit merely because, in his opinion, unlawful conduct on the part of others will result from the parade. "Narrowly drawn statutes regulating these activities are not impossible to pass . . . ." *Gregory*, 394 U.S. at 124, 89 S.Ct. at 953. (Black, J., concurring). But we cannot rewrite the ordinance for the city. "It is not our duty and indeed not within our power to set out and define with precision just what statutes can be lawfully enacted to deal with situations like the one confronted here . . . ." *Id.* at 118, 89 S.Ct. at 950. The provision as written, however, clearly trenches upon First Amendment rights.

### (c) Vagueness

The City of Tupelo attempts through this provision to prevent unlawful conduct that *might* result if an applicant is granted a permit. "[T]he Constitution does not bar enactment of laws regulating conduct, even though connected with speech, press, assembly, and petition, if such laws bar only the conduct deemed obnoxious and are carefully and narrowly aimed at that forbidden conduct." *Gregory*, 394 U.S. at 118, 89 S.Ct. at 950 (Black, J., concurring).

■■■■ This provision, however, is not so carefully tailored. In an attempt to prohibit disorderly conduct, it silences First Amendment rights by denying citizens access to public streets because the Chief of

Police thinks that criminal conduct is likely to follow. This provision is unconstitutionally vague since it contains no instructions directing the Chief in the formulation of his opinion. Arbitrary and discriminatory law enforcement cannot be prevented unless statutes provide definite standards for those who apply them. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–2299, 33 L.Ed.2d 222 (1971). Laws which vest public officials with unlimited discretion are void for vagueness. *Id.; Coates*, 402 U.S. at 614, 91 S.Ct. at 1688; *Gregory*, 394 U.S. at 120, 89 S.Ct. at 951 (Black, J., concurring); *Shuttlesworth*, 394 U.S. at 151–152, 89 S.Ct. at 938–939; *Thornhill*, 310 U.S. at 97–98, 60 S.Ct. at 741–742. This undefined, broad grant of authority to the Chief of Police may prevent obnoxious conduct, but as Justice Roberts noted in *Hague v. C.I.O.*, 307 U.S. at 516, 59 S.Ct. at 964, "the prohibition of all speaking will undoubtedly 'prevent' such eventualities. [The] uncontrolled official suppression of [First Amendment rights] cannot be made a substitute for the duty to maintain order...."

This clause of § 1(c) is unconstitutional because its terms are so vague that the public officials chosen to enforce the ordinance may act in an arbitrary and discriminatory manner in granting or denying permits and still be completely within the scope of the ordinance.

### 2. "will probably cause injury"

Appellants contend that this provision is vague because it does not define clearly the limits of the Chief's power. This provision authorizes the Chief to deny a permit if, in his opinion, the parade "will probably cause injury to persons or property." The term "probably" is simply too vague and indefinite and does not control adequately the discretion of the Chief in his determination of when to grant or deny a permit.

In *Shuttlesworth*, 394 U.S. at 147, 89 S.Ct. at 935, the Supreme Court invalidated a Birmingham parade licensing ordinance which permitted the licensor to deny a license if, in his opinion, the public health,

welfare, safety, decency, good order, morals or convenience of the community would be adversely affected. The Court held that "a municipality may not empower its licensing officials to roam essentially at will, dispensing or withholding permission to speak, assemble, picket or parade according to their own opinions regarding the potential effect of the activity...." *Id.* at 153, 89 S.Ct. at 940.

The Tupelo ordinance suffers from the same defect condemned in *Shuttlesworth* because it conditions the exercise of First Amendment rights on the virtually unguided opinion of an official regarding the potential effects on the proposed parade. This provision of the ordinance is unconstitutional.

### 3. "create a disturbance"

Appellants allege that this clause is overbroad because it encompasses constitutionally protected activity. "Disturbance" is defined in the Mississippi Code as "including but not restricted to... loud and offensive talk... breach of peace... threats and attempts to intimidate." Miss.Code Ann. § 97–35–15 (1973). Unlike the disorderly conduct statute, this law has been given a narrowing construction by the Mississippi Supreme Court, *McLaurin v. Burnley*, 279 F.Supp. 220 (N.D.Miss.1967), *aff'd*, 401 F.2d 773 (5th Cir. 1968), *cert. denied*, 399 U.S. 928, 90 S.Ct. 2228, 26 L.Ed.2d 795 (1970), so that it punishes only non-peaceful speech. It cannot be used to punish those whose peaceful speech arouses anger in others.

We are not called upon to judge the constitutionality of this provision as a penal statute, however. We must evaluate the constitutionality of this provision as a part of a licensing ordinance empowering a public official to deny access to the public streets if he believes that the proposed parade will result in conduct which the government has a legitimate interest in penalizing. As such, this part of the ordinance is unconstitutional because it vests in the licensor unbridled discretion to determine when, in his opinion, it is likely that criminal conduct will occur in the future.

The licensing statute condemned by the Supreme Court in *Hague v. C.I.O., supra*, contained a provision similar to this one: the public official was authorized to refuse a permit if, in his opinion, to do so would prevent "riots, disturbances, or disorderly assemblage." 307 U.S. at 516, 59 S.Ct. at 964. The Court refused a free hand to this type of official discretion to control the First Amendment rights of citizens. Likewise, in *Kunz v. New York, supra*, the Court struck down a permit system which authorized the denial of a permit if a public official believed the proposed activity would be unlawful.

 This part of the Tupelo ordinance suffers from the same defect. It allows a public official to deny a permit based upon his own opinion of whether future conduct will probably be unlawful. In this Court's opinion in *ISKCON v. Eaves, supra*, we discussed at length the unconstitutionality of a provision in a licensing ordinance which sanctioned the denial of a permit to those who had violated provisions of the ordinance in the past. 601 F.2d at 832–33. The inferences to be drawn from past conduct were insufficient to justify the denial of permits in the future. This part of the Tupelo ordinance rests on an even weaker foundation than evidence of past guilt; with no evidence whatsoever the Chief is empowered to predict future conduct. If denials under the Atlanta ordinance in *Eaves* based on past occurrences are impermissible, then certainly denials under Tupelo's ordinance which are based on no evidence whatsoever, are unconstitutional.

### B. Section 2

 The City of Tupelo is justified in regulating the time, place and manner of parades; however, it must not do so in any arbitrary or overly restrictive manner. *Grayned v. City of Rockford*, 408 U.S. at 115–16, 92 S.Ct. at 2302–2303; *Cox v. Louisiana*, 379 U.S. 559, 562, 85 S.Ct. 476, 479, 13 L.Ed.2d 487 (1965); *Kunz*, 340 U.S. at 294, 71 S.Ct. at 315; *Abernathy v. Conroy*, 429 F.2d 1170, 1173–74 (4th Cir. 1970). Appellants contend that Tupelo unduly restricts their First Amendment rights by imposing an arbitrary and overbroad time cut-off for all parades. Appellants concede, as they must, that the City of Tupelo has a legitimate interest in protecting the security and the peaceful environment of its citizens, especially at night. As the City explains, the number of policemen on duty at night is smaller than during the daytime and the job is further complicated by the darkness. Appellants argue, however, that the 6 p. m. cut-off is arbitrary because it remains light in Tupelo well past 6 p. m. for a good part of the year. The result is that appellants and others are unnecessarily restricted in the time in which they may parade. We agree with this contention.

Tupelo's reliance on *Abernathy v. Conroy, supra*, in which a Charleston, South Carolina ordinance was upheld, is misplaced. The Charleston ordinance prohibited parades after *8 p. m.* and was upheld because of the city's interest in nighttime security. *Id.* at 1174. The Tupelo ordinance prohibits parades after 6 p. m., and, as the City concedes, it remains light in Tupelo well past 6 p. m. for much of the year. If Tupelo wants to restrict parading to daylight hours, it may do so; however, the regulation must be drawn to insure minimal intrusion on First Amendment rights.

We recognize the difficulty Tupelo faces in pinpointing the exact time at which the nighttime security problems arise. In striking this provision, we do not mean to say that the daytime cut-off must fluctuate daily to reflect the actual time of the sunset, although regulations based on the time of sunset are common and are not difficult to administer. The City may choose a later time, as did Charleston, which would better accomodate First Amendment interests, or it may choose to vary the time according to season and/or whether daylight savings time is in effect. The 6 p. m. cut off may be reasonable during the winter months, but is unreasonable in the summer when the sun sets as late as 8:30 p. m. As written, this section of the ordinance is unconstitutionally overbroad because it extends beyond the bounds of legitimate regulation.

### C. Section 3(a)

In this section the City of Tupelo attempts to regulate the conduct of the marchers by requiring that all paraders be unarmed, line up no more than four abreast, in the right-hand lane of the street, in units of 100 or fewer, with fifteen foot intervals between units. The claimed purpose of these regulations is to preserve public safety. Tupelo desires to accomodate the marchers and city traffic simultaneously by allowing the marchers to use one lane of the street and on-coming traffic the other. The marchers are required to leave fifteen foot spaces between segments of the parade so firetrucks or police cars can get through quickly in case of emergencies. We find nothing wrong with these regulations as such; however, the fact that various groups of marchers (students and governmental agencies) are exempted from the regulations by Section 5 of the ordinance raises questions under the Equal Protection Clause of the Fourteenth Amendment. *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 94–98, 92 S.Ct. 2286, 2289–2291, 33 L.Ed.2d 212 (1972). Because First Amendment rights are at stake, we must scrutinize carefully this provision to determine "whether there is an appropriate governmental interest suitably furthered by the differential treatment." *Id.* at 95, 92 S.Ct. at 2289. *See also Weber v. Aetna Casualty & Surety Co.*, 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972); *Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *Reed v. Reed*, 404 U.S. 71, 75–77, 92 S.Ct. 251, 253–254, 30 L.Ed.2d 225 (1971).

The groups excepted from the ordinance will create traffic problems and threats to public safety caused by the physical presence of the paraders in exactly the same way any parade would. Thus, if Tupelo were truly interested in traffic control, it would confine *all marchers* to one lane and groups of 100 or fewer. Because the City is so willing to disregard the traffic problems in those circumstances, we cannot accept the contention that traffic control is a substantial interest. As long as the exceptions remain in the ordinance, the regulations in § 3(a) constitute an unconstitutional discrimination.

### D. Section 3(d)

This section also attempts to regulate the conduct of marchers by requiring that "[a]ll persons involved shall conduct themselves in an orderly manner, and no profanity shall be used." Appellants assert that the terms "orderly manner" and "profanity" are vague and overbroad.

#### (a) "Orderly manner"

Appellants argue that this term is so indefinite that "men of common intelligence must necessarily guess as its meaning . . . ." *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). We construe this term just as we did the term "disorderly conduct" in our discussion of Section 1(c)(1), *supra*. Following the reasoning *supra*, however, we must conclude that the term is overbroad. Persons may be acting in a manner other than "orderly" yet still be constitutionally protected. "Disorderly conduct" and "conduct. . . in an orderly manner" are equally overbroad. For this reason, we strike this part of the ordinance. *See Coates, supra*, (facially invalidating ordinance that criminalized "annoying" behavior because it encompassed many types of conduct clearly beyond the proper bounds of state regulation); *Gregory, supra*, (invalidating on overbreadth grounds a disorderly conduct statute which could be used to punish citizens who refuse to move on when asked to do so by a policeman).

#### (b) "And no profanity shall be used"

This clause does not seek merely to regulate the time, place, and manner of parades; rather, it directly prohibits a certain kind of speech. An outright prohibition such as this can be sustained only if it proscribes unprotected speech. *Plummer v. City of Columbus*, 414 U.S. 2, 3, 94 S.Ct. 17, 18, 38 L.Ed.2d 3 (1973); *Gooding v. Wilson, supra*. The issue then is whether profanity constitutes unprotected speech. To date, the Supreme Court has identified only two

categories of unprotected speech into which profanity might possibly fall: obscenity, *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) and fighting words, *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). Appellee refers to § 47–29–47 of the Mississippi Code regarding the meaning and application of profanity statutes in Mississippi. The Mississippi Supreme Court has construed the term to mean "any words importing an appreciation of divine vengeance, or implying divine condemnation...." *Orf v. State*, 147 Miss. 160, 113 So. 202 (1927) (sustaining conviction for saying "damn" in a public place). Such an application of the law clearly runs afoul of constitutional freedoms. *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (overturning conviction under breach of peace statute because, although vulgar and crude, language used by defendant was not in anyway erotic or personally abusive and was therefore constitutionally protected). While it is conceivable that profanity might, in some circumstances, also constitute obscenity or fighting words, this statute does not confine itself only to those situations, and it has not been so narrowed by the Mississippi courts. Thus, this portion of the statute is unconstitutional.

### E. Sections 5(b) and (c)

Appellants next challenge Sections 5(b) and (c) as violative of the Equal Protection Clause. These sections grant exemptions to students participating in educational activities, (5(b)), and governmental agencies, (5(c)), from both the licensing and regulatory requirements. In analyzing this provision the crucial question is whether there is a legitimate and important governmental interest which will be furthered by the differential treatment of various groups. *Carey v. Brown*, 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980); *Grayned v. City of Rockford, supra; Police Dept. of the City of Chicago v. Mosley, supra; Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274. The City offers as a justification for this differential treatment the fact that those groups excepted from the ordinance pose less of a "security risk" than other groups. As the City conceded at trial, the excepted groups disrupt the flow of traffic and emergency vehicles to the same extent as any other group parading through the streets. The asserted difference, then, must be that the content of the speech of groups involved in protests, demonstrations, or advocacy poses a greater security risk than that of traditional groups whose parades tend to be merely festive.

Differential treatment of groups based on the content of their speech is established to be unconstitutional. *Mosley*, 408 U.S. at 95–98, 92 S.Ct. at 2289–2291; *Cox v. Louisiana*, 379 U.S. 536, 581, 85 S.Ct. 453, 470, 13 L.Ed.2d 471 (1965). Tupelo attempts to justify the ordinance by asserting that the purpose of the differentiation is to prevent the "security risks" posed by groups other than those excepted from the ordinance. The concept of "security risks" takes on special significance in First Amendment context. *See New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (contention that disclosure of Pentagon Papers would to some extent jeopardize national security was inadequate reason for prior restraint upon publication). To uphold this disparate treatment based on Tupelo's designation of some groups as "security risks," we would have to find that those parades subject to the ordinance will "surely result in direct, immediate, and irreparable damage...." *Id.* at 730, 91 S.Ct. at 2149. (Stewart, J., concurring). The record is totally devoid of such evidence. "Predictions about imminent disruption from [parading] involve judgments appropriately made on an individualized basis, not by means of broad classifications...." *Mosley*, 408 U.S. at 100–101, 92 S.Ct. at 2292–2293. *See also Carey, supra*. Tupelo has classified groups based on the content of their speech without showing any legitimate and compelling interest to justify the differential treatment. Thus, this section of the ordinance is unconstitutional.

## III. THE SOUND EQUIPMENT ORDINANCE

Appellants challenge three sections of Tupelo's sound equipment ordinance alleging that § 1B vests unbridled discretion in the Chief of Police in the granting and denying of permits and that §§ 2A and 3 are overbroad because they prohibit constitutionally protected activity.

### A. Section 1B

This section details the information an applicant must provide the Chief of Police in order to obtain a permit to operate sound equipment. Appellants challenge that portion of the section which provides that "the applicant shall demonstrate to the Chief of Police the noise level to be emitted by the equipment." They contend that this section is defective because it authorizes the Chief to refuse a permit if he determines that the equipment emits noises which are loud and raucous without giving narrow and objective standards to be used in the determination.

■ The First Amendment protects the use of sound equipment as a form of expression. *Saia v. New York*, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948); *Reeves v. McConn, supra.* The right to use sound equipment, however, is subject to reasonable regulation by the government. *Kovacs v. Cooper*, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949). The distraction that might be caused by such equipment can be dangerous in traffic-filled areas and a nuisance in residential areas. State and local governments have a legitimate interest in regulating the use of sound equipment to accomodate the needs of the community as well as the speaker.

In *Saia v. New York, supra,* the Supreme Court invalidated a city ordinance which gave a public official uncontrolled discretion in granting and denying permission to use sound equipment on city streets. The next year, the Court upheld an ordinance prohibiting entirely the use of sound equipment if the sound emitted was loud and raucous. *Kovacs v. Cooper*, 336 U.S. at 87, 69 S.Ct. at 453.

■ In determining the constitutionality of an ordinance regulating sound equipment, we must look carefully at the ordinance and the purposes which it is to serve. The ordinance "must represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society . . . ." *Broadrick v. Oklahoma*, 413 U.S. at 611–12, 93 S.Ct. at 2915. The court must "weigh heavily the fact that communication is involved and require that the regulation be narrowly tailored to further the State's legitimate interest." *Reeves v. McConn*, 631 F.2d at 383.

■ Appellants are correct in their legal argument that sound equipment permits may be denied only through the application of narrowly drawn statutes which circumscribe the discretion allowed the licensor in his decision-making. *Saia v. New York, supra; Reeves v. McConn, supra.* This particular part of the ordinance, however, does not run afoul of these principles. All that it requires is that the applicant demonstrate the noise level; there is nothing on the face of the ordinance that can be interpreted to mean that the Chief of Police can deny a permit based on this demonstration.

In the course of applying this statute, if the Chief of Police denies permits because of the demonstrated noise level of the equipment, the applicant will be able to make the argument appellants attempt to make today. Because we are judging only the facial validity of the statute, we cannot assume that this is how it will be applied and determine its constitutionality in that setting.[4]

### B. Section 2A

This section prohibits the use of sound equipment at any time in areas "which are zoned for residential purposes." Appellants assert that this provision is overbroad be-

---

**4.** The record does not indicate that a permit has ever been denied on the basis of noise level. Plaintiffs were denied a permit, but the denial was based on another section of the ordinance.

cause it prohibits First Amendment activity in areas where such activity has not been shown to be incompatible with "the pattern" of the "normal activities" of all residentially zoned areas. *Grayned v. City of Rockford*, 408 U.S. at 116, 92 S.Ct. at 2303, 33 L.Ed.2d 222.

■ Municipalities may impose reasonable time, place, and manner restrictions on the use of sound equipment, *Saia*, 334 U.S. at 562, 68 S.Ct. at 1150, provided the regulations are narrowly tailored "to further significant government interests...." *Grayned*, 408 U.S. at 115, 92 S.Ct. at 2302. "[T]he nature of a place, 'the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable....' The crucial question is whether the manner of expression is basically incompatible with the normal activities of a particular place at a particular time." *Reeves*, 631 F.2d at 384, quoting *Grayned*, 408 U.S. at 116, 92 S.Ct. at 2303. Appellants contend that the blanket prohibition of the use of sound equipment in areas zoned residential is overbroad because it in effect creates an irrebuttable presumption that all areas zoned residential are at all times incompatible with sound equipment.

In *Reeves v. McConn, supra*, we invalidated a provision in a sound equipment ordinance enacted by the city of Houston, Texas which prohibited the use of sound trucks in the downtown business district except for certain hours on Sunday. We considered carefully the nature of the downtown area in accordance with the *Grayned* test and concluded that the provision was overbroad because although the city had legitimate interests preventing disruption in the downtown area, the provision was not narrowly tailored to serve only those interests. *Id.* at 384–385.

■ We find that this provision of the Tupelo ordinance is overbroad because it extends beyond what are deservedly protected actual residential areas. We do not imply that sound equipment must be permitted in areas which are totally residential. Sound equipment may well be incom-

patible with certain neighborhoods and certain areas within neighborhoods where people reside. This ordinance, however, presumes incompatability because an area is *zoned* residential. Often times areas zoned residential include structures other than homes, such as churches and schools, which are not incompatible with the use of sound equipment. "Predictions about imminent disruption from [the use of sound equipment] involve judgments appropriately made on an individualized basis, not by means of broad classifications." *Mosley*, 408 U.S. at 100–101, 92 S.Ct. at 2292–2293. Because the ordinance extends its total and non-discretionary prohibition to areas which have not been shown to be incompatible with sound equipment, it is unconstitutionally overbroad.

### C. Section 3

This section prohibits the operation of sound equipment at any location between the hours of 6:00 p. m. and 9:00 a. m. Appellants argue that this provision is overbroad because, while nighttime restrictions might be justifiable, this ordinance prohibits activity during hours when the City does not have a substantial interest in doing so.

■ The considerations discussed in our review of § 2A above and § 2 of the parade ordinance are applicable here. This time limitation provision must be narrowly tailored to serve a substantial interest. *Grayned*, 408 U.S. at 116–117, 92 S.Ct. at 2303. The City attempts to justify this provision by stressing the increased security problems at night, as well as the need to protect citizens in their enjoyment of the peace and tranquillity of nighttime.

■ We accept the City's justifications for the ordinance to the extent that it covers activities after sunset. As we noted in our discussion of Section 2 of the parade ordinance, *supra*, however, there is daylight in Tupelo after 6:00 p. m. for a considerable part of the year. This ordinance reaches more broadly than is reasonably necessary to protect legitimate state interests. It prohibits sound trucks in the downtown and

shopping center areas in daylight when many people are abroad. It is unconstitutionally overbroad.

## IV. CONCLUSION

We find that §§ 1(c)(1), 2, 3(a), 3(d), 5(b), and 5(c) of the parade ordinance and §§ 2A and 3 of the sound equipment ordinance are unconstitutional. Accordingly, we reverse the judgment of the district court with respect to the above-named provisions. We affirm the district court's judgment holding § 1B of the sound equipment ordinance constitutional.

AFFIRMED in part; REVERSED in part.

## APPENDIX

### ORDINANCE REGULATING PARADES, PROCESSIONS, AND PUBLIC DEMONSTRATIONS

. . . . .

SECTION 1. *Permit—Required; application; granting.*

. . . . .

(c) The chief of police of the city shall grant a written permit for such parade, procession or other public demonstration, prescribing the streets or other public ways which may be used therefor, unless he finds:

(1) the conduct of the parade will probably cause injury to persons or property or provoke disorderly conduct or create a disturbance;

. . . . .

SECTION 2. *Time Restrictions.*

No permit shall be granted under this section for a parade, procession, or other public demonstration to begin after 6:00 p. m.

. . . . .

SECTION 3. *Conduct of Participants.*

Participants in such parades, processions or other public demonstrations shall conduct themselves in the following manner:

(a) All persons walking or riding shall be unarmed and without explosives of any kind and those walking will line up no more than four (4) abreast in right-hand lane of traffic in units of one hundred (100) or less, with an interval of fifteen (15) feet being maintained between units.

. . . . .

(d) All persons involved shall conduct themselves in an orderly manner, and no profanity shall be used.

. . . . .

SECTION 5. *Exceptions to Ordinance.*
This Ordinance shall not apply to:

. . . . .

(b) students participating in educational activities provided that they are under the immediate direction and supervision of school authorities;

(c) governmental agency acting within the scope of its functions.

### ORDINANCE REGULATING USE OF SOUND TRUCKS AND SOUND AMPLIFIERS WITHIN THE CITY OF TUPELO, MISSISSIPPI

. . . . .

SECTION 1. *Permit Required.*

. . . . .

B. To secure said permit, written application shall be made to the Chief of Police of said City. Such application shall describe the sound amplification equipment to be used, the purpose for which such equipment will be used, and the applicant shall demonstrate to the Chief of Police the noise level to be emitted by the equipment.

. . . . .

SECTION 2. *Area Restrictions.*

A. No permit shall be granted to permit the use of sound trucks or sound amplification equipment on the streets in residential neighborhoods. Those areas of the City which are zoned for residential purposes shall be considered residential neighborhoods for the purpose of this Ordinance, and no sound truck or sound amplification equipment will be permitted on the streets in such areas at any time.

. . . . .

## 518

SECTION 3. *Time Restrictions.*

No permit will be granted for the use of sound truck or sound equipment anywhere in the City of Tupelo during the hours from 6:00 p. m. to 9:00 a. m.

. . . . .

GEE, Circuit Judge, concurring in part and dissenting in part:

With two minor exceptions only, I concur in the excellent opinion of the court. I am unable to agree with its invalidation of Section 2 of the parade ordinance (pp. 512–513) or of Section 2A of the sound-truck one (pp. 515–516).

The former provision prohibits parades, processions and such from *beginning* after 6:00 p. m. and is struck down because maintaining nighttime security is its basis, and nightfall occurs in Tupelo somewhat later than that time during some of the year. At other seasons, of course, it occurs at about the time specified or even earlier. The time selected as a cut-off seems to me a reasonable approximation, within the range of legislative discretion. Nor does this limitation seem to me all that different from the one approved in *Abernathy v. Conroy*, 429 F.2d 1170 (4th Cir. 1970), referred to with apparent approval by the majority. There the ordinance upheld required that parades and the like *conclude* by 8:00 p. m. Since most parades last for an hour or two, commencing before 6:00 p. m. and concluding before 8:00 p. m. seem to me to come to about the same thing.

For similar reasons, denying permits for sound trucks in residential areas and defining these areas as those zoned for residential purposes seem to me reasonable legislative approximations to effect an admittedly legitimate purpose. Absent a suggestion of some fraudulent or invidious motive—the majority takes each provision on its face and suggests nothing of the kind—these provisions, while perhaps not perfect, seem to me appropriate and valid efforts at reasonable regulation and the action of the majority striking them down over-exacting.